Paul RENDON, Appellant,

v.

**Robert Kevin AVANCE, Tina Marie Avance, Morgan Nichole Avance, and Cole Henderson Avance, Appellees.**

No. 2–00–012–CV.

Court of Appeals of Texas, Fort Worth.

Dec. 6, 2001.

Publication Ordered Jan. 10, 2002.

Fletcher & Springer, L.L.P., Kenneth J. Lambert, Douglas D. Fletcher, Dallas, for Appellant.

Charles W. McGarry, Dallas, for Appellee.

Panel A: CAYCE, C.J., DAUPHINOT and GARDNER, JJ.

## OPINION

LEE ANN DAUPHINOT, Justice.

### I.  INTRODUCTION

This is an appeal from a judgment awarding damages to appellees Robert

Kevin Avance, his wife Tina Marie Avance, and their children Morgan Nichole Avance and Cole Henderson Avance (Avances) in their suit against appellant Paul Rendon (Rendon). In six issues, Rendon contends: (1) the trial court erred in excluding the testimony of an expert witness; (2) the trial court erred in failing to properly discount the awards for future damages; (3) the evidence was legally and factually insufficient to support the award for lost earning capacity; (4) the award for past medical expenses was supported by a purported summary that included calculation errors; (5) Robert Avance's injuries were not "serious, permanent and disabling" so as to support the awards for loss of parental consortium; and (6) the trial court erred in refusing to consider a valid settlement agreement between Rendon and the Avances. We affirm.

## II. FACTUAL BACKGROUND

On November 11, 1993, Robert Avance (Robert) sustained a traumatic brain injury when the vehicle he was driving collided with the back of a truck driven by Rendon, an employee of H.B. Zachry, Co. (Zachry). The incident occurred in Fort Worth as the vehicles traveled westbound in the left-hand lane of State Highway 180, also known as East Lancaster Avenue, in a construction area where Zachry was making road improvements. Immediately before the collision, Rendon had made an abrupt stop in order to turn left across the highway onto a side road used in the construction project.

Two vehicles following Rendon and Robert were not involved in the collision, although both drivers observed it. Ira Henry drove a vehicle traveling in the right lane next to Avance, and Mark Valenti drove a vehicle traveling behind Avance. Mark Selby, the Zachry project engineer, arrived a few minutes after the collision and, along with another employee, took a videotape of the scene, including a test to determine whether the brake lights on the back of the Zachry truck were working.

When the collision occurred, Robert's head crushed the windshield of his vehicle, although he was wearing his seat belt, and he was rendered unconscious and bleeding from the head. When his wife saw him at the hospital, he had cuts all over his face. Robert suffered a traumatic brain injury as a result of the collision, and his initial symptoms included headaches, memory loss, and anxiety attacks.

Unable to cope with his work as a bank loan officer, Robert was fired in 1994. Along with migraine headaches and agitation, Robert suffered thereafter from severe depression. After his wife took their children to live with his parents, Robert received treatment at a rehabilitation center for an addiction to pain killers. At the time of trial in October 1998, Robert's condition had improved, and he was able to hold down a position working with people suffering from chronic pain. His anxiety and headaches continued, however, and he will need medical care for the rest of his life.

## III. PROCEDURAL BACKGROUND

The Avances sued Rendon, Zachry, and certain Nissan Motor Company entities (Nissan) for damages arising from the November 11, 1993 collision. Pursuant to a settlement agreement, an interlocutory judgment disposed of the Avances' claims against Nissan. Thereafter, an agreed severance order made the Avances' claims against Rendon the subject of the instant separate action and abated their claims against Zachry. The trial court also granted the Avances' motion for partial summary judgment on Rendon's counterclaim alleging breach of a settlement agreement.

Following a jury trial, the trial court signed a final judgment on November 15, 1999 awarding the Avances a judgment against Rendon. The judgment reduced the total jury award of $1,961,140.06 by the percentage of negligence of 15% that the jury found against Robert and by $337,500 based on the Avances' settlement with Nissan. After including prejudgment interest, the judgment awarded $1,288,314.88 to Robert Kevin Avance, $402,847.69 to Tina Marie Avance, $151,566.46 to Morgan Nichole Avance, and $151,566.46 to Cole Henderson Avance. On December 9, 1999, the trial court denied Rendon's motion for new trial and motion for remittitur. Thereafter, Rendon filed a timely notice of appeal.

## IV. DISCUSSION

### A. Exclusion of Expert Witness Testimony

In his first issue, Rendon contends that the trial court erred in excluding the testimony of Steve Irwin (Irwin), an accident reconstruction expert. The record shows that on February 4, 1998, counsel for the Avances retained Irwin to reconstruct the accident and provide an aerial photo. On September 18, 1998, thirty-one days before trial, the Avances supplemented their discovery responses by listing Irwin as one of their expert witnesses. On that same day, the defendants sent a notice to take Irwin's deposition on written questions, and Zachry sent a discovery response listing Irwin as both a fact witness and as one of the "Plaintiff's Retained Experts." The parties do not dispute that Rendon likewise designated Irwin as a potential expert witness in same manner as Zachry.

On October 8, 1998, the Avances supplemented their discovery responses by designating Irwin as a consulting expert who would not be called as a witness but whose conclusions, opinions, or impressions had been reviewed by testifying experts. By letter dated October 12, 1998, the Avances "de-designated" Irwin as a testifying witness and "redesignated" him as a "consulting only expert." The letter further stated that Irwin had not been relied upon by other testifying experts and would not be produced for deposition. On October 15, 1998, the Avances sent a supplemental discovery response stating that the redesignation of Irwin as a consulting expert upon whose opinions other experts relied was inadvertent and a clerical error and that it was their was intention to redesignate him as a consulting only expert. Also on October 15, 1998, following two notices by the defendants to take Irwin's oral deposition, the trial court granted the defendants' motion to compel and ordered Irwin to appear for a deposition on or before October 19, 1998.

On October 16, 1998, Rendon sent a notice to take the oral deposition of Irwin on October 17, 1998, and Irwin was deposed on that date. Irwin first testified at the deposition concerning his educational background and experience in accident reconstruction. Irwin testified that he had reviewed the videotape made after the collision that was marked as Defendants' Exhibit 40 and was shown a photograph of the back of the Zachry vehicle. Irwin testified that it looked like the brake lights were being illuminated.

At trial, the Avances objected to the admission of Irwin's deposition based on the consulting expert exemption and their de-designation of him as an expert witness. After hearing testimony and argument of counsel, the trial judge excluded the deposition based on the "protection afforded under the rules for consulting experts."

■ We review a trial court's exclu-

sion of evidence for an abuse of discretion.[1] We only find an abuse of discretion when the trial court's decision is arbitrary, unreasonable, and without reference to guiding principles.[2] To obtain reversal of a judgment, the appellant must show that the trial court did in fact commit error and that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment.[3] That is, we determine whether the judgment turns on or is controlled by the particular evidence excluded.[4] In making that determination, we review the entire record.[5]

The consulting-expert privilege provided by former rule 166b [6] of the Texas Rules of Civil Procedure grants parties and their attorneys a sphere of protection and privacy in which to develop their case:

> Under the consulting-expert privilege, parties and counsel may consult with an expert to attempt to recreate an accident and test their litigation theories. If the expert's conclusions support the consulting party's case, that expert may be designated a witness for trial. If, on the other hand, the expert's conclusions do not support the party's case, the identity of the expert and his or her conclusions need not be revealed to the other side.[7]

■ Texas law permits a testifying expert to be de-designated so long as it is not part of a bargain between adversaries to suppress testimony or for some other improper purpose.[8] That is, a de-designation is ineffective where it violates the policy underlying the rules of discovery.[9] The primary policy behind discovery is to seek truth so that disputes may be decided by facts that are revealed rather than concealed.[10] The protection afforded by the consulting expert privilege is intended to be only a shield to prevent a litigant from taking undue advantage of his adversary's industry and effort, not a sword to be used to thwart justice or to defeat the salutary objects of discovery.[11]

■ In this case, Rendon contends that the trial court erred in excluding Irwin's deposition testimony despite the de-designation by the Avances because Rendon had properly designated Irwin as a testifying witness. Rendon further argues that the Avances' redesignation one week before trial was "suspect at best, and should be strongly discouraged." Rendon does not contend that the Avances' de-designation was done as part of an improper agreement. Nor does Rendon articulate any specific, improper purpose for the de-designation. Assuming without deciding, however, that the trial court abused its

---

1. *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989).

2. *Mercedes–Benz Credit Corp. v. Rhyne,* 925 S.W.2d 664, 666 (Tex.1996).

3. *Gee,* 765 S.W.2d at 396.

4. *See City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753–54 (Tex.1995).

5. *Id.* at 754.

6. Tex.R. Civ. P. 166b, 785–786 S.W.2d LI–LV (1990, repealed 1999). The current rule took effect January 1, 1999. *See* Tex.R. Civ. P. 192.3(e).

7. *General Motors Corp. v. Gayle,* 951 S.W.2d 469, 474 (Tex.1997).

8. *Castellanos v. Littlejohn,* 945 S.W.2d 236, 240 (Tex.App.-San Antonio 1997, orig. proceeding); *Lopez v. Martin,* 10 S.W.3d 790, 794 (Tex.App.-Corpus Christi 2000, pet. denied).

9. *Tom L. Scott, Inc. v. McIlhany,* 798 S.W.2d 556, 560 (Tex.1990) (orig.proceeding).

10. *Id.* at 559.

11. *Id.*

discretion in excluding Irwin's deposition, we hold that the error was not reversible.

Whether the videotape made after the collision showed that Rendon's brake light was working was a critical issue in that Valenti testified for the Avances that the brake light on the Zachry truck did not come on prior to the collision and further testified that Henry, the driver of another vehicle, stated that the truck had no brake lights. Valenti also testified that the videotape showed flasher lights, not brake lights.

Irwin's testimony that in the videotape it "looked like" the brake light was working was cumulative, however, of Selby's testimony and Rendon's testimony that the videotape showed that the brake light was working. While Rendon later testified that he could not remember whether he was testing the brake lights at that point, the jury was also able to view the videotape.

Rendon argues that Irwin's expert testimony was key to rebutting that of the nonexpert Valenti. Irwin did not testify, however, that he had conducted any tests on the Zachry truck's lights or that his testimony as to what the videotape showed was based on any scientific, technical, or other specialized knowledge.[12] Irwin's testimony that the videotape showed the brake light to be working was thus cumulative of other properly admitted evidence as well as the videotape itself, and we do not view the excluded testimony, which was not shown to be based on any reliable,

specialized expertise, as controlling on a material issue dispositive to the case.[13]

■ Moreover, viewing the record in its entirety, we do not view the exclusion of Irwin's other deposition testimony concerning the operation of the blinker light and the legal duties of a driver, such as Robert, as controlling on a material, dispositive issue. Rendon has thus not shown any error that was calculated to and probably did cause rendition of an improper judgment. Accordingly, we overrule Rendon's first issue.

## B. Discount of Future Damages Awards

In his second issue, Rendon contends that the judgment fails to reflect the present value of the $210,000 awarded to Robert in future medicals or the $345,000 awarded for future loss of earning capacity. Rendon further contends that there was no testimony at trial as to the present value of these amounts, and they were not reduced to reflect present value.

■ It is well settled, however, that while the jury must assess damages to accrue in the future on the basis of their amount if paid now in cash, no evidence of the earning power of money must be introduced.[14] The jury has the power to consider as proven any matter that is of common knowledge.[15]

The concurring opinion in *Border Apparel–East, Inc. v. Guadian*, 868 S.W.2d 894 (Tex.App—El Paso 1993) argues that *Kimbrell* was wrong in concluding that the jury knows and can take judicial knowl-

---

12. *See Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 725 (Tex.1998) (discussing the reliability requirements for expert testimony).

13. *See Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex.2000) (holding that erroneous rulings on admissibility of evidence are ordinarily not reversible when the evidence in

question is cumulative and not controlling on a material issue dispositive to the case).

14. *Mo. Pac. R.R. Co. v. Kimbrell*, 160 Tex. 542, 334 S.W.2d 283, 286 (1960).

15. *Id.*

edge of interest rates and determine a proper discount.[16] Chief Justice Osborne suggests that it would be better to not instruct the jury to reduce future damages to present cash value but rather let the trial judge, based upon discount rates and annuity tables, make the reduction in the final judgment.[17]

In this case, the trial court followed *Kimbrell,* however, and instructed the jury to calculate the awards for future medical care and future loss of earning capacity in terms of a sum of money "if paid now in cash." Under *Kimbrell,* the jury was qualified to make the calculation based on its common knowledge of interest rates, and "no evidence of the earning power of money" was required to be introduced.[18] Moreover, we must presume that the jury properly followed the trial court's instructions.[19]

Rendon contends nevertheless that the amounts awarded Robert were not reduced to present value. Rendon argues that it is clear that the jury award of $210,000 based on the evidence of $237,318.50 to $248,810.50 for future medical care did not have an adjustment for present value. Rendon further argues that the Avances' closing argument suggesting that Robert lost $10,000 a year in future earning capacity when multiplied by a life expectancy of 33.8 years would calculate to $338,000, and that because the award exceeds that amount by $7,000, no discount to present value was made.

As discussed below, however, apart from the Avances' closing argument, there was evidence of Robert's past earnings as a bank officer, his banking experience and educational progress, the periods of no earnings after the injury, his gradual return to the work force outside of banking, and his physical and emotional limitations and disabilities after the injury. The amount of a plaintiff's loss of earning capacity is always uncertain and must be left largely to the sound judgment and discretion of the jury.[20]

In support of his contention, Rendon cites *Republic Bankers Life Insurance Co. v. Jaeger.*[21] In *Jaeger,* an award for benefits under a disability insurance policy was set aside on the basis that the trial court erred in calculating damages by failing to discount unaccrued payments to their present value.[22] *Jaeger* is distinguishable from this case, however, in that it involved a trial to the court where it was clear from the record that the $18,000 award represented the maximum recovery under the policy, and it was clear that the trial court had not made any discount and thus had not applied the correct measure of damages.[23]

Rendon also cites *Kansas City Southern Railway Co. v. Lawson.*[24] In *Lawson,* the evidence developed at a motion for new trial hearing, including testimony of jurors, showed that the jurors did not discount

16. 868 S.W.2d 894, 899 (Tex.App.-El Paso 1993, no writ) (Osborn, C.J., concurring).

17. *Id.* at 900.

18. *Kimbrell,* 334 S.W.2d at 286.

19. *Turner, Collie & Braden, Inc. v. Brookhollow, Inc.,* 642 S.W.2d 160, 167 (Tex.1982).

20. *McIver v. Gloria,* 140 Tex. 566, 169 S.W.2d 710, 712 (1943).

21. 551 S.W.2d 30 (Tex.1976).

22. *Id.* at 31.

23. *See id.*

24. 435 S.W.2d 582 (Tex.Civ.App.-Beaumont 1968, no writ).

future earnings in making their award.[25]

In this case, however, Rendon has not demonstrated that the jury disregarded the trial court's instruction to calculate each of the awards in question in terms of a sum "if paid now in cash." We presume, therefore, that the jury properly followed the trial court's instruction. Accordingly, we overrule Rendon's second issue.

## C. Evidence of Loss of Earning Capacity

In his third issue, Rendon contends that the evidence was legally and factually insufficient to support the award of $176,000 for past lost earning capacity and the award of $345,000 for future lost earning capacity.

■ In determining a legal insufficiency or "no-evidence" issue, we consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary.[26] If there is more than a scintilla of such evidence to support the finding, the challenge fails.[27] An assertion that the evidence is factually insufficient means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered.[28] We consider all of the evidence in the case in making this determination.[29]

■ As stated above, the determination of the amount of a personal injury plaintiff's loss of earning capacity is always uncertain and must be left largely to the sound judgment and discretion of the jury.[30] The verdict must be based on something more than mere conjecture, however, and must be an intelligent judgment, based upon such facts as are available.[31] Each case must be judged upon its peculiar facts, and the damages must be proved with that degree of certainty of which the case is susceptible.[32]

Specific factors that may be considered in determining the amount of loss of future earning capacity have been explained as follows:

> Factors such as stamina, efficiency, ability to work with pain, and the weakness and degenerative changes which naturally result from an injury and from long suffered pain are legitimate considerations in determining whether or not a person has experienced an impairment in future earning capacity.... Our courts have consistently upheld judgments for reduced earning capacity, even though the plaintiff was making as much or even more money after the injury than before, where it was shown that pain, weakness, diminished functional ability, or the like indicated that plaintiff's capacity to get and hold a job, or his capacity for duration, consistency

---

**25.** *Id.* at 586.

**26.** *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996); *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex. 1995); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

**27.** *Cazarez,* 937 S.W.2d at 450; *Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex.1996).

**28.** *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965).

**29.** *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.), *cert. denied,* 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998).

**30.** *McIver,* 169 S.W.2d at 712.

**31.** *Id.*

**32.** *Id.*

or efficiency of work was impaired.[33]

■ In this case, the evidence shows that after sustaining the traumatic brain injury when his head crushed the windshield of his vehicle on November 11, 1993, Robert was unable to perform the duties of his job as a bank loan officer and was fired the following year. Due to his migraine headaches, memory loss, anxiety attacks, and severe depression, Robert was unable to work. His disabling condition was then compounded when he developed an addiction to pain-killer prescription drugs. After taking a janitorial position with a pain management center, however, Robert progressed to being able to hold a job as a counselor to people suffering from chronic pain, a position that he held at the time of trial in October 1998.

The record shows that Robert's earnings at Guaranty Federal Bank were $43,020.36 in 1993 and $24,399.67 in 1994. He had no earnings in 1995 and 1996, but earned $32,813.64 at the pain management center in 1997. At trial, Robert testified that he expected to earn about $56,000 in 1998. Robert had, at that time, a life expectancy of 33.8 years.

Robert testified that he believed he had a very good future at the bank before he got hurt. He was very enterprising and hard working in his full-time position, and he was taking American Institute of Banking evening classes that would have soon led to a commercial lending degree. After the injury, Robert suffered from debilitating depression and will probably battle over his lifetime the brain injury symptoms of photophobia, difficulty handling noise, stimulation and stress, anxiety and depression.

Based on our review of the entire record, we conclude that the jury was apprised of the available facts pertaining to Robert's past earnings and earning capacity. The evidence shows that Robert's promising banking career was cut short in 1994 when he was unable to cope with or do his job. The jury, in the exercise of its sound discretion, was in a position to make a reasonable estimate, based on Robert's life expectancy, of his loss of earnings had he been able to continue to advance in his banking career. While Robert was able to earn a substantial salary in 1998, the jury was entitled to consider such factors as the pain, weakness, and diminished functional ability that Robert would continue to experience from his traumatic brain injury and that would limit his ability to earn an income.

We hold that the evidence is legally and factually sufficient to support the jury's verdict awarding damages for past and future lost earning capacity. The verdict was not based on mere conjecture but rather on evidence having the degree of certainty of which this case is susceptible. Accordingly, we overrule Rendon's third issue.

**D. Evidence of Past Medical Expenses**

■ In his fourth issue, Rendon contends that the evidence is insufficient to support the jury's award of $112,140.06 for "past medicals." Rendon argues that the only evidence of the amount was Plaintiffs' exhibit 7 and that three of the items listed on the exhibit's summary page are in error because they do not conform to the affidavits included in the exhibit. Rendon asks that the judgment be reversed and remanded for a new trial. Alternatively, Rendon asks that the judgment be modi-

**33.** *Springer v. Baggs,* 500 S.W.2d 541, 544–45 (Tex.Civ.App.-Texarkana 1973, writ ref'd n.r.e.).

fied to reduce the award by $2,288. In light of the relief sought, we consider the issue as a factual sufficiency challenge. We note that Rendon preserved this issue by including it in his motion for new trial.

When considering a factual sufficiency challenge, courts of appeals must consider and weigh all of the evidence, not just that evidence which supports the verdict.[34] A court can set aside the verdict only if it is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust.[35] The court of appeals is not a fact finder. Accordingly, the court may not pass upon the witnesses' credibility or substitute its judgment for that of the jury, even if the evidence would clearly support a different result.[36]

During the testimony of Dr. John Claude Krusz, Plaintiffs' counsel offered their exhibit 7, a compilation of Robert's medical bills along with affidavits and a summary. When the defense counsel stated "No objection," the trial court admitted the exhibit. Dr. Krusz then testified, without objection, that Robert's medical bills totaled $112,140.06 and that they were reasonable and necessary as a result of the automobile accident of November 11, 1993.

Contrary to Rendon's contention, Plaintiffs' exhibit 7 was not the only evidence of Robert's medical expenses. Dr. Krusz testified, without objection, that the total amount of Robert's past medical expenses was $112,140.06, and the credibility of the witness's testimony was a matter for the jury to decide.[37] Moreover, the exhibit itself contained the same total figure.

While Rendon argues that the affidavits included in Plaintiffs' exhibit 7 call for a different computation, it was the jury's prerogative to consider the billing time periods and resolve any discrepancies in light of all the evidence. We hold that the amount awarded for Robert's past medical expenses is not so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. Moreover, defense counsel's statement of no objection when Dr. Krusz testified to the total amount of Robert's medical bills waived any complaint concerning the factual support for that testimony.[38] We overrule Rendon's fourth issue.

### E. Award for Loss of Parental Consortium

In his fifth issue, Rendon contends that the evidence was legally and factually insufficient to support the jury's finding that Robert's injuries were "serious, permanent, and disabling" and to support any award to Robert's children Morgan and Cole for past and future loss of parental consortium.

In *Reagan v. Vaughn*, the Texas Supreme Court held that children may recover for loss of consortium when a third party causes serious, permanent, and disabling injuries to their parent.[39] *Reagan* requires the plaintiff to show that the defendant physically injured the parent in a manner that would subject the defendant to liability.[40] The child may recover for such nonpecuniary damages as loss of the parent's love, affection, protection, emo-

---

34. *Ellis*, 971 S.W.2d at 406–07.

35. *Id.* at 407.

36. *Id.*

37. *See id.*

38. *See Crown Cent. Petroleum Corp. v. Coastal Transp. Corp.*, 38 S.W.3d 180, 189–90 (Tex. App.-Houston [14th Dist.] 2001, no pet.).

39. 804 S.W.2d 463, 467 (Tex.1990).

40. *Id.*

tional support, services, companionship, care, and society.[41] The factors that the jury may consider in determining the amount of damages include, but are not limited to, the severity of the injury to the parent and its actual effect upon the parent-child relationship, the child's age, the nature of the child's relationship with the parent, the child's emotional and physical characteristics, and whether other consortium-giving relationships are available to the child.[42]

Rendon argues that Robert's injuries were not "serious, permanent, and disabling" and were far less severe than those present in *Reagan* where the parent was operating as a six-to-seven-year-old or in other cases that have recognized a cause of action for loss of parental consortium.[43]

Rendon argues that in adopting the "serious, permanent, and disabling" standard, the Arizona Supreme Court in *Villareal* clarified the meaning of that phrase by requiring that the parent's mental or physical impairment be so overwhelming and severe that the parent-child relationship is destroyed or nearly destroyed. Rendon notes that *Villareal* was cited with approval in *Reagan* and argues that the *Villareal* standard should be applied in Texas.

*Reagan* cited *Villareal,* however, in support of its recognition of a cause of action in Texas for loss of parental consortium, not for its statement of the severity of injury required for liability.[44] *Reagan* stated the standard as follows: "when the

facts are disputed, there must be a threshold finding by the finder of fact that the injury to the parent was a serious, permanent, and disabling injury."[45] The terms "serious, permanent, and disabling" should be given their ordinary meaning, and we decline to restrict their meaning by requiring that the injury be so overwhelming and severe that the parent-child relationship is destroyed or nearly destroyed.

The evidence shows that Robert suffered a traumatic brain injury with concussional problems, loss of consciousness, memory problems, anxiety, and headaches. Dr. Krusz explained that the use of the term "mild" as part of the description of the traumatic brain injury was kind of a misnomer: "It's just one of three or four ways of categorizing different clusters of patients with brain trauma according to how much ... there was any bleeding to the brain, fractured skull, how long the coma persists." Robert's brain injury included frontal lobe injury affecting different kinds of memory, temporal lobe injury affecting auditory processing, brain stem injury causing dizziness and vertigo, and diffuse axonal injury affecting nerve fibers.

As a result of the injury, Robert suffered from migraine headaches, seizures, anxiety attacks, and depression. He also had decreased motor skills exhibited through tremors and visual deficits. He was less able to screen out light, noise, and sound stimulation and tested in the extreme range for anxiety, depression, hostility, and self-punishment.

**41.** *Id.*

**42.** *Id.*

**43.** *See Brindza v. Mobil Oil Corp.,* 802 S.W.2d 706 (Tex.App.-Beaumont 1991, no writ) (involving a totally incapacitated parent); *Villareal v. State Dep't of Transp.,* 160 Ariz. 474, 774 P.2d 213 (1989) (requiring a showing that the injury is so severe as to destroy or nearly

destroy the parent-child relationship); *Hay v. Medical Ctr. Hosp.,* 145 Vt. 533, 496 A.2d 939, 946 (1985) (limiting recovery to when the parent has been rendered permanently comatose).

**44.** *Reagan,* 804 S.W.2d at 466.

**45.** *Id.* at 468 (op. on reh'g).

Consequently, Robert was unable to cope with his work as a bank loan officer and was fired in 1994. Along with migraine headaches and agitation, Robert suffered thereafter from severe depression. After his wife took the children to live with his parents because she did not want the children to see Robert "not functioning" anymore, Robert received treatment at a rehabilitation center for an addiction to pain killers. After the accident, Robert's interaction with his children changed dramatically. He would easily get agitated and yell at Cole for making noise, and Cole continues to fear upsetting his father. Morgan became withdrawn, and her grades slipped. The family members continue to deal with Robert's mood swings and fear what is going to set off one of his headaches.

At the time of trial in October 1998, Robert's condition had improved, and he was able to hold down a position working with people suffering from chronic pain. His anxiety, debilitating migraine headaches, and depression continue, however, and he will have these problems and need medical care for the rest of his life.

Rendon points to evidence that Robert suffered a "cerebral contusion" or bruising of the brain that was also described as a "mild, traumatic brain injury" and evidence comparing the concussion to that suffered by a football player. Rendon does not argue the injuries were not "severe," however, but rather argues that they were "far less severe" than in *Reagan, Brindza, Villareal,* and *Hay.* He points out that there was little evidence to support a continuation to the time of trial of Robert's agitation and yelling at the children and notes that in May 1996 Robert had done Te Kwon Do with his kids, an activity in which Robert occasionally participated at the time of trial.

Rendon argues that there must be a major, permanent destruction of the parent-child relationship in order for the jury to find that the Robert's injury was "serious, permanent, and disabling." We decline to require a showing, however, that the parent-child relationship was destroyed or nearly destroyed. Moreover, in considering the evidence in support of the jury's finding, we believe that the term "permanent" should be given its ordinary meaning. That is, the injury must be one that is "continuing or enduring" and "without fundamental or marked change."[46] As the Avances argue, the term "permanent" refers to whether Robert will suffer the injuries for the rest of his life.

Rendon also argues that the evidence is insufficient to support "any" award for loss of parental consortium. The issue is not, therefore, whether the awards were excessive but rather whether the evidence is legally and factually sufficient to support the jury's finding that Robert's injury was "serious, permanent, and disabling."

Considering the evidence and inferences that tend to support the jury's finding and disregarding all evidence and inferences to the contrary, we hold that there is more than a scintilla of evidence to support the finding, and the challenge to the legal sufficiency of the evidence to support the finding thus fails.[47] Furthermore, the challenge to the factual sufficiency of the evidence to support the finding must also fail. That is, we have considered all the evidence and conclude that the evidence supporting the finding that the injury is "serious, permanent, and disabling" is not so weak or contrary to the overwhelming weight of the evidence that the verdict is

---

**46.** WEBSTER'S NEW INTERNATIONAL DICTIONARY 1683 (3d. ed.1981).

**47.** *See Leitch,* 935 S.W.2d at 118.

clearly wrong and unjust.[48] Accordingly, we overrule Rendon's fifth issue.

### F. Denial of Counterclaim Based on Alleged Oral Settlement Agreement

In his sixth issue, Rendon contends that the trial court erred in refusing to consider a valid settlement agreement between Rendon and the Avances. In his original counterclaim, Rendon alleged that the Avances had breached a settlement agreement made at mediation under which they agreed to settle with Zachry and Rendon for a sum of $15,000. Rendon further alleged that although the agreement, which was drafted and signed by the mediator, Robert and Tina Avance, and the attorneys for the parties, did not specifically mention Rendon, "all parties and counsel knew and understood that he was to be included within the agreement as an employee of H.B. Zachry Company."

The Avances thereafter filed a motion for partial summary judgment with a handwritten agreement between the Avances and Zachry attached. The motion alleged that (1) Rendon's original counterclaim was an untimely, waived attempt to assert the affirmative defense of "release"; (2) Rendon was not named in or a party to the alleged agreement; and (3) the alleged agreement did not comport with rule 11 of the Texas Rules of Civil Procedure.

In his first amended counterclaim, Rendon alleged alternatively that the parties "entered into an oral settlement agreement at the July 20, 1995 mediation, whereby plaintiffs' agreed to settle, release

and dismiss their claims against Rendon in return for the payments agreed to in the Zachry settlement." Rendon also filed a response to the Avances' motion for partial summary judgment. The trial court granted the motion for partial summary judgment "except as to Rendon's claims regarding the existence of an oral settlement agreement."

The Avances thereafter filed a first amended answer to Rendon's counterclaim, specifically denying that they had entered into an oral agreement with Rendon at the mediation and further asserting that the alleged settlement agreement did not comport with rule 11 of the Texas Rules of Civil Procedure. After the Avances filed a second motion for partial summary judgment as to Rendon's counterclaim, the trial court granted the motion without qualification. An agreed severance order subsequently made the Avances' claims against Rendon the subject of the instant separate action and abated their claims against Zachry.

In a summary judgment case, the issue on appeal is whether the movant met his summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.[49] The burden of proof is on the movant, and all doubts about the existence of a genuine issue of material fact are resolved against the movant.[50] Therefore, we must view the evidence and its reasonable inferences in the light most favorable to the nonmov-

---

48. See *Ellis*, 971 S.W.2d at 407.

49. Tex.R. Civ. P. 166a(c); *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex.1999); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979).

50. *Rhone–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex.1999); *Friendswood Dev. Co. v. McDade + Co.*, 926 S.W.2d 280, 282 (Tex. 1996); *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex.1965).

ant.[51] A defendant is entitled to summary judgment if the summary judgment evidence establishes, as a matter of law, that at least one element of a plaintiff's cause of action cannot be established.[52]

■ In this case, Rendon argues that a cause of action existed for breach of the oral settlement agreement and that rule 11 should not apply to oral settlement agreements. Rule 11 provides:

> Unless otherwise provided in these rules, no agreement between attorneys or parties touching any suit pending will be enforced unless it be in writing, signed and filed with the papers as part of the record, or unless it be made in open court and entered of record.[53]

■ Compliance with rule 11 is a general prerequisite for any judgment enforcing an agreement touching a pending suit.[54] Once a party disputes the existence of an oral agreement, it is unenforceable unless it complies with rule 11.[55] An oral agreement becomes unenforceable the moment its existence is disputed in the pleadings.[56]

In this case, the Avances specifically denied that they entered into an oral settlement agreement with Rendon at the July 20, 1995 mediation and further asserted that the alleged settlement agreement did not comport with rule 11. Rendon does not contend on appeal that the alleged settlement agreement was in writing, signed, and filed with the papers as part of the record. Nor does Rendon contend that the alleged agreement was made in open court and entered of record. Under *Kennedy*, the alleged oral settlement agreement in this case did not comply with rule 11 and was not enforceable.[57]

While Rendon argues that rule 11 should not apply to oral settlement agreements, he candidly recognizes that *Kennedy* and *Padilla v. LaFrance*[58] hold otherwise. He further argues that *Kennedy* was wrongly decided and should no longer be followed. While recognizing that this court does not have the authority to overrule or modify *Kennedy* or *Padilla*, Rendon states that the argument must be made in this court to preserve any such argument for the Texas Supreme Court. We decline to accept Rendon's suggestion that we not follow those cases in order to "enhance the prompt resolution of this issue."

Moreover, Rendon's other arguments do not alter our conclusion that the record shows no enforceable oral settlement agreement between him and the Avances. *Hur v. City of Mesquite*, cited by Rendon, holds that a party may bring a suit for breach of contract arising out of mediation.[59] *Hur* does not address or otherwise establish an exception to rule 11, however, and is thus distinguishable from the instant case where the record shows that the alleged oral settlement agreement was challenged and shown to be unenforceable as not in compliance with rule 11.

**51.** *Great Am.*, 391 S.W.2d at 47.

**52.** *Elliott–Williams Co. v. Diaz*, 9 S.W.3d 801, 803 (Tex.1999).

**53.** TEX.R. CIV. P. 11.

**54.** *Kennedy v. Hyde*, 682 S.W.2d 525, 529 (Tex.1984).

**55.** *Alcantar v. Okla. Nat'l Bank*, 47 S.W.3d 815, 819 (Tex.App.-Fort Worth 2001, no pet.).

**56.** *Kennedy*, 682 S.W.2d at 530.

**57.** *See id.*

**58.** 907 S.W.2d 454, 461 (Tex.1995).

**59.** 893 S.W.2d 227, 234 (Tex.App.-Amarillo 1995, writ denied).

Rendon also cites *Tindall v. Bishop, Peterson & Sharp, P.C.*, which held that an unsigned settlement agreement dictated to and transcribed by the court reporter, although not in compliance with rule 11, was enforceable as an exception to the Statute of Frauds.[60] While *Kennedy* recognized that there are well recognized exceptions to rule 11 such as where an undisputed stipulation is given effect despite literal noncompliance with the rule, we need not decide whether an exception to rule 11 should be recognized based on the reasoning in *Tindall* because the record shows no memorandum of a third party purporting to accurately recite the terms of the alleged agreement.

Finally, Rendon contends that a deposition of the mediator should be allowed as to the existence and terms of the oral settlement agreement. Rendon cites *Stevens v. Snyder*[61] as allowing testimony from persons involved in a mediation to determine the details surrounding a settlement agreement. *Stevens* concerned a *written* settlement agreement, however, and while testimony was allowed concerning the agreement, the testimony did not serve to establish compliance with rule 11.

The Avances argue that the trial court properly denied discovery from the mediator under the confidentiality statutes applicable to alternative dispute resolution procedures.[62] Whether or not the mediator's testimony would have been confidential under the referenced statutes, however, Rendon does not contend that the mediator's testimony would have disclosed an agreement that met the requirements of rule 11 or any recognized exception to the rule. Rather, Rendon argues that he was prevented from developing evidence that *may*

meet the *Tindall* exception to rule 11. Rendon does not allege that any memorandum of the alleged oral agreement exists as in *Tindall*, however, and we conclude that the trial court acted within its discretion in denying discovery concerning the alleged oral settlement agreement.

The record thus does not support Rendon's contention that the Avances breached an enforceable oral settlement agreement. Therefore, Rendon has not shown that the trial court erred in granting partial summary judgment against him on his counterclaim. Accordingly, we overrule Rendon's sixth issue.

## V. CONCLUSION

Having overruled all of Rendon's issues, we affirm the trial court's judgment.

CAYCE, C.J. concurs without opinion.

---

60. 961 S.W.2d 248, 251 (Tex.App.-Houston [1st Dist.] 1997, no writ); *see also* TEX. BUS. & COM.CODE ANN. § 26.01(a), (b)(6) (Vernon 1987).

61. 874 S.W.2d 241, 243–44 (Tex.App.-Dallas 1994, writ denied).

62. *See* TEX CIV. PRAC. & REM.CODE ANN. §§ 154.053, 154.073 (Vernon Supp.2002).