COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-05-216-CV

 

 

GENERAL MOTORS CORPORATION                                        APPELLANT

 

 

                                                   V.

 

 

CHRIS BURRY, STACEY BURRY, AND                                      APPELLEES

CHRIS
BURRY, AS NEXT FRIEND FOR

RACHEL
BURRY, SARAH BURRY, AND

MEGHAN
BURRY, MINORS

 

 

                                              ------------

 

              FROM
THE 271ST DISTRICT COURT OF WISE COUNTY

 

                                              ------------

 

                                OPINION
ON REHEARING

 

                                              ------------

Upon consideration of
appellant General Motors Corporation=s motion for rehearing, we deny the motion; however, we withdraw our
opinion and judgment of June 29, 2006 and substitute the following to make a
nonsubstantive clarification.








I.  Introduction

This is a
classic battle of the experts case:  a
products liability design defect case arising out of a traffic accident in
which Stacey Burry, a passenger in a 2001 Chevrolet Suburban, was permanently
brain damaged.  Appellant General Motors
Corporation (GM), the manufacturer of the Suburban, appeals from a jury verdict
finding that GM was liable for forty-nine percent of Stacey=s injuries because of a design defect in the Suburban and assessing
approximately $38 million in damages against GM and Carol Reid, the driver of
the Suburban, whom the jury found fifty-one percent responsible.[1]  In five issues, GM contends that (1) there is
no evidence that a design defect in the Suburban caused Stacey=s injuries, (2) there is no evidence of any design defect in the
Suburban, (3) several of the trial court=s evidentiary rulings constitute reversible error, (4) the jury was
biased, unqualified, and erroneously instructed, and (5) the evidence is
legally and factually insufficient to support the jury=s damage awards.  We modify the
judgment to delete the bystander damage awards and affirm it as modified.

 

 








II.  Background Facts

On January 27, 2003, Stacey,
her mother Carol, and Stacey=s three daughters, Rachel, Sarah, and Meghan, were traveling eastbound
on Interstate 30 near Sulphur Springs, Texas. 
Carol was driving the 2001 Chevrolet Suburban, and Stacey was the front
passenger.  The three girls were in the
middle seats, with Rachel directly behind Stacey.  

Carol exited the interstate
and immediately attempted to turn right into a shopping center, crossing double
white lines to do so.  As she was moving
across the access road, an eighteen-wheeler, which was traveling in the access
road, struck the Suburban.  The
eighteen-wheeler=s left front
fender initially hit the Suburban near its right rear wheel.  The impact rotated the front right side of
the Suburban into the front of the eighteen-wheeler so that the Suburban and
eighteen-wheeler were perpendicular to each other and the eighteen-wheeler was
pushing the Suburban sideways for a short time. 
Then the Suburban spun off of the eighteen-wheeler in a clockwise motion
once or twice and landed in some dirt on the right side of the access road.








Rachel, who was closest to
the initial impact, suffered a contusion on her head and several breaks in her
right leg.  The other girls had no
injuries.  Carol was knocked unconscious
but otherwise had no injuries.  Stacey,
however, struck the B-pillarCthe part of the Suburban frame between the front passenger section
window and middle section passenger windowCas it intruded into the passenger compartment.[2]  The Suburban was equipped with front and side
airbags, but no airbags deployed in the accident.  Stacey was in a coma for ten weeks and
suffered severe brain damage as a result of her injuries. 

Stacey, her husband Chris,
and Chris as next friend for Rachel, Sarah, and Meghan, sued GM and Carol
alleging that design defects in the Suburban and Carol=s negligence caused Stacey=s injuries.  After a nine-day
trial, a jury found Carol fifty-one percent liable, and GM forty-nine percent
liable, for Stacey=s
injuries.  The jury also awarded
appellees approximately $38 million in damages.

III.  No-Evidence Issues

In its first two issues, GM
contends that there is no evidence to support the jury=s findings that the 2001 Suburban had a design defect and that if
there was a defect, it caused Stacey=s injuries.  We will review
these issues first.  See Gross v. Burt,
149 S.W.3d 213, 229 n.12 (Tex. App.CFort Worth 2004, pet. denied) (op. on reh=g).

 

 








A.  Standard of Review

A legal sufficiency challenge
may only be sustained when:  (1) the
record discloses a complete absence of evidence of a vital fact; (2) the court
is barred by rules of law or of evidence from giving weight to the only
evidence offered to prove a vital fact; (3) the evidence offered to prove a
vital fact is no more than a mere scintilla; or (4) the evidence establishes
conclusively the opposite of a vital fact. 
Uniroyal Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334 (Tex.
1998), cert. denied, 526 U.S. 1040 (1999); Robert W. Calvert, "No
Evidence" and "Insufficient Evidence" Points of Error,
38 TEX. L. REV. 361, 362-63 (1960).  In determining whether there is legally
sufficient evidence to support the finding under review, we must consider
evidence favorable to the finding if a reasonable factfinder could, and
disregard evidence contrary to the finding unless a reasonable factfinder could
not.  City of Keller v. Wilson,
168 S.W.3d 802, 827 (Tex. 2005).








Anything more than a
scintilla of evidence is legally sufficient to support the finding.  Cont=l Coffee Prods. Co. v. Cazarez, 937 S.W.2d
444, 450 (Tex. 1996); Leitch v. Hornsby, 935 S.W.2d 114, 118 (Tex.
1996).  When the evidence offered to
prove a vital fact is so weak as to do no more than create a mere surmise or
suspicion of its existence, the evidence is no more than a scintilla and, in
legal effect, is no evidence.  Kindred
v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983).  More than a scintilla of evidence exists if
the evidence furnishes some reasonable basis for differing conclusions by
reasonable minds about the existence of a vital fact.  Rocor Int=l, Inc. v. Nat=l Union Fire Ins. Co., 77 S.W.3d
253, 262 (Tex. 2002).

Any ultimate fact may be
proved by circumstantial evidence.  Russell
v. Russell, 865 S.W.2d 929, 933 (Tex. 1993).  A fact is established by circumstantial
evidence when the fact may be fairly and reasonably inferred from other facts
proved in the case.  Id.  However, to withstand a legal sufficiency
challenge, circumstantial evidence still must consist of more than a
scintilla.  Blount v. Bordens, Inc.,
910 S.W.2d 931, 933 (Tex. 1995). 
Absent an objection to the jury charge, the sufficiency of the evidence
is reviewed in light of the charge submitted. 
Wal-Mart Stores, Inc. v. Sturges, 52 S.W.3d 711, 715 (Tex. 2001).

B.  Existence of
Design Defect








GM contends that there is no evidence that the 2001
Suburban had any design defects because appellees Aoffered only
unqualified speculation to support their theory that GM=s design was
unreasonably dangerous.@ 
Appellees= theory at trial was that the Suburban
should have had a dual-sensor system governing deployment of the side airbag,
that it should have had a side airbag with head protection instead of just
thorax protection, and that the B-pillar should have contained extra padding.

1.  Qualifications of Appellees= Experts

As a threshold matter, GM contends that appellees= experts were not
qualified to opine about the design of GM=s side airbag
system and any proposed alternatives to it; therefore, the trial court erred by
allowing their testimony. 

A witness with the appropriate knowledge, skill,
experience, training, or education is qualified to testify as an expert.  Tex.
R. Evid. 702; Roberts v. Williamson, 111 S.W.3d 113, 121 (Tex.
2003); Toshiba Machine Co., Am. v. SPM Flow Control, Inc., 180 S.W.3d
761, 778 (Tex. App.CFort Worth 2005, pet. granted, judgm=t vacated
w.r.m.).  Whether an expert is qualified
under rule 702 is a preliminary question to be decided by the trial court, and
the party offering the expert=s testimony bears
the burden of proving the witness=s
qualifications.  Gammill v. Jack
Williams Chevrolet, Inc., 972 S.W.2d 713, 718 (Tex. 1998); Broders v.
Heise, 924 S.W.2d 148, 151 (Tex. 1996). 
The decision to admit expert testimony is within the trial court=s discretion and
will not be disturbed on appeal unless the trial court has abused its
discretion.  Gammill, 972 S.W.2d
at 718‑19; Toshiba, 180 S.W.3d at 778.








In deciding whether an expert is qualified, the trial court
Amust ensure that
those who purport to be experts truly have expertise concerning the actual
subject about which they are offering an opinion.@  Helena Chem. Co. v. Wilkins, 47 S.W.3d
486, 499 (Tex. 2001).  General experience
in a specialized field is insufficient to qualify a witness as an expert.  Pack v. Crossroads, Inc., 53 S.W.3d
492, 506 (Tex. App.CFort Worth 2001, pet. denied).  AWhat is required
is that the offering party establish that the expert has >knowledge, skill,
experience, training, or education= regarding the
specific issue before the court which would qualify the expert to give an
opinion on that particular subject.@  Broders, 924 S.W.2d at 153.








GM challenges the qualifications of Don Friedman and Geoff
Mahon, experts appellees proferred to testify about the design of the Suburban=s side impact
protection system.  Specifically,
Friedman testified that the Aoccupant
protection system@ in the Suburban Adid not provide
the protection that would be expected in a side impact, and it didn=t perform in a way
that one would expect in . . . an accident of this severity.@  Friedman=s testimony
focused on whether a side airbag would have protected Stacey from the interior
of the passenger compartment if it had deployed.  Mahon, an airbag sensor engineer, testified
regarding the deficiency of the sensing system for the passenger side airbag
and opined that a safer alternative system would have included a second sensor
to increase the likelihood of deployment of the side airbag.

GM contends that Friedman was not qualified because he Alast worked in the
automotive industry over twenty years ago and has no experience with side
airbags.@  GM points out that Friedman Anever ran a crash
test with side impact airbags, never designed a side impact airbag, never
designed a vehicle with side impact airbags, and never wrote any papers about
side impact airbags.@

Friedman testified that he had been involved in vehicle
design for fifty-seven years and that he had worked for GM designing vehicles
from 1960-68.  He had designed fifteen
cars and six Aother vehicles.@  After leaving GM, Friedman founded an
automotive research and development company. 
Friedman testified that he had been investigating injuries that occur in
real world accidents since 1970, about thirty-five years.  He agreed that in his research he had
investigated how an occupant moves once a vehicle is contacted. 








Friedman testified on voir dire that he had never run a
crash test with side airbags, nor had he ever personally designed a side airbag
system.  Although he had written papers
about side impacts, he had never written papers about side impact airbags.  But Friedman also testified that he had
designed frontal airbags before.  He had
also worked on designs to minimize side impact injuries in five vehicles.  Friedman had also worked on an experimental
research safety vehicle for the federal government that was never manufactured,
but that could protect unbelted occupants in a forty mile per hour side impact
collision.   Friedman had built and
tested airbags that protected unbelted occupants from fifty mile per hour
impacts and authored numerous papers, reports, and government research on
airbags, padding, and side impacts.  He
had investigated about thirty rollover cases with Suburbans and CK vehicles.[3]            In
his deposition testimony, Friedman stated that most of his work at that time
was research and was mostly related to rollovers and rollover occupant
protection, which included Asome relationship
to the side impact.@  In
1986 or 1988, he did computer modeling to analyze the performance of side
impact airbags, but he had never done any statistical analysis of side impact
airbags.  But when asked whether he had Adone statistical
analysis of crash conditions and their relationship to injuries,@ Friedman
answered, ACertainly. 
That=s what I described as the basis for an
appropriate design consideration.@  Friedman had looked at GM crash tests when
side airbags deployed and how they kept a dummy away from the side of the
vehicle. 








Friedman testified at trial that if the installed thorax
side airbag in the Suburban had timely deployed, it would have kept Stacey=s body, and thus,
her head, away from the intruding B-pillar and Suburban interior.  This opinion was based on Friedman=s study and
reconstruction of the accident and his understanding of the way the human body
interacts with intruding vehicle components during a collision.

Friedman was offered as an expert with knowledge of the
consequences to and behavior of vehicles and occupants in crashes, including
side impact crashes, and how to design vehicles to minimize the impact to
occupants in vehicle crashes, including side impact crashes.  Based on the foregoing, we hold that the
trial court did not abuse its discretion in determining that Friedman was
qualified to testify on the actual subject on which he offered an opinion.








GM further contends that Mahon, an airbag sensor engineer,
was not qualified to testify regarding the sensing system on the Suburban
because Mahon testified that his role as a sensing engineer was limited to
developing a sensing system based on criteria provided by the vehicle
manufacturer.  He explained that his
experience in the industry had been that the manufacturer decided how severe a
crash must be before it wanted the airbag to deploy and then Mahon would design
a system in which the airbag would deploy in crashes at least as severe as
those dictated by the manufacturer. 
According to GM, this testimony shows that AMahon deferred to
manufacturers= deployment criteria and had no experience
establishing this criteria himself.@ 

Mahon testified that he began working as an airbag sensor
engineer in 1987 for a company that designed airbags and airbag sensors for
automotive companies.  That company at
one point had Avirtually 100 percent@ of GM=s and Ford=s business.  Mahon eventually became a vice president of
the company, which has since gone bankrupt. 

Mahon expanded on his explanation about how he designed
sensors based on criteria provided by the automotive companies by adding that 

because the testing that is done in
the industry doesn=t cover every possible crash, my
role is a little bit more than just picking a point [for deployment] and saying
if I meet that point, that=s fine.  You=ve got to look at meeting the
severity requirements.  

 

Generally
speaking, those severity requirements are based on injury criteria.

 








In an affidavit presented by appellees to the trial court
pretrial, Mahon averred that A[o]ver the years,
[he had] personally reviewed literally thousands of crash test accelerometer
plots and [had] a comprehensive understanding of all aspects of air bag sensor
development crash testing.@  He also averred that A[t]o ensure that
our customers had at least a basic understanding of the principles of crash
sensing,@ he designed and
taught a course known as Sensor 101 to engineers from various automotive
companies, including GM.  In the course,
Mahon covered Athe difference between crush and passenger
compartment sensing methodologies, sensor system design, sensor calibration,
and other matters of interest to restraint engineers.@  According to Mahon, A[t]he course was
designed to inspire discussions of ways to solve crash sensing problems . . .
admittedly with . . . sensors@ manufactured by
his former company. 

Mahon further averred in the affidavit that A[a]s a result of
the time spent in the automotive industry where [he] was involved in the design
and manufacturing of air bag crash sensors, [he] gained considerable knowledge
about how they perform under various conditions.@  From May 1988 through the early 1990s, Mahon
was Aresponsible for
the sensor calibration and simulation activities of the corporation.@  Mahon stated further that

[c]rash sensing for side impact
crashes is no different in principle than crash sensing for frontal impact
crashes.  The differences are in the
details rather than the basic principles. . . . 
The significant difference between side impact events and frontal events
is that there is much less time to gather data and make a decision in a side
impact than in a frontal impact. 

 








Mahon=s testimony and affidavit show that in
order to design a side airbag sensing system based on manufacturers= criteria, he had
to have  comprehensive knowledge not only
of how those sensors work, but when they must work based not only
on the manufacturers= criteria, but on injury criteria as
determined by crash tests and industry knowledge.  We hold that the trial court did not abuse
its discretion in determining that Mahon was qualified to testify about the
actual subject on which he offered an opinion.

Thus, we conclude that the trial court did not abuse its
discretion by determining that Friedman and Mahon were qualified to testify
about the design of the Suburban=s airbag system
and by denying GM=s motions to exclude their testimony. 

2. 
Evidence of Unreasonably Dangerous Design and Safer Alternative Design

GM also contends
that there is no evidence that the design of the side airbag system in the
Suburban was unreasonably dangerous or that a safer alternative design existed.


a.  Applicable Law








When a claimant alleges a design defect,
the burden is on the claimant to prove by a preponderance of the evidence that
(1) there was a safer alternative design and (2) the defect was a producing
cause of the personal injury, property damage, or death for which the claimant
seeks recovery.  Tex. Civ. Prac. & Rem. Code Ann. ' 82.005(a) (Vernon
2005); Davis v. Conveyor-Matic, Inc., 139 S.W.3d 423, 429 (Tex. App.CFort Worth 2004,
no pet.).  A claimant must not only meet
the proof requirements of the statute but must show, under the common law, that
the product was defectively designed so as to be unreasonably dangerous, taking
into consideration the utility of the product and the risks involved in its
use.  Hernandez v. Tokai Corp., 2
S.W.3d 251, 257 (Tex. 1999); Honda of Am. Mfg., Inc. v. Norman, 104
S.W.3d 600, 604 (Tex. App.CHouston [1st
Dist.] 2003, pet. denied).

b.  Side Airbag
Design

Appellees contended at trial that Stacey=s side airbag
should have deployed in this type of accident; GM contended that the deployment
of a side airbag was not necessary in this type of accident and that GM
specifically designed the side airbag system not to deploy in this type of
accident.

1.       Unreasonably Dangerous








GM first contends that it was entitled to a presumptionCwhich appellees
did not overcomeCthat the Suburban did not have a design
defect because it had complied with standards promulgated by the National
Highway Transportation Safety Administration (NHTSA)[4]
for the side structures of vehicles, which for 2001 vehicles did not require
manufacturers to install any type of side airbag whatsoever.[5]  To support its contention, GM cites section 82.008(a) of the civil practice and remedies code and Harper.  Tex.
Civ. Prac. & Rem. Code Ann. ' 82.008(a) (Vernon
2005); Harper, 61 S.W.3d at 124.

Section 82.008(a), which
provides that a defendant in a products liability suit is entitled to a
rebuttable presumption of no design defect when it shows it has complied with
NHTSA minimum standards, applies only to suits filed on or after July 1, 2003.[6]  Tex.
Civ. Prac. & Rem. Code Ann. ' 82.008(a).  This case was filed
on May 28, 2003, so the rebuttable presumption in section 82.008(a) is not
applicable here.








Harper held that A[c]ompliance with
NHTSA regulations provides a presumption of no design defect.@  Harper, 61 S.W.3d at 124 (citing Sims
v. Washex Machinery Corp., 932 S.W.2d 559, 565 (Tex. App.CHouston [1st
Dist.] 1995, no writ)) (emphasis added). 
But Sims stands only for the proposition that evidence of such
compliance is strong and substantialCbut not conclusiveCevidence that a
product was not defectively designed.  Sims,
932 S.W.2d at 565 (citing Lorenz v. Celotex Corp., 896 F.2d 148, 150-51 (5th Cir. 1990), which cites 59 Tex. Jur. 3d Products Liability ' 67 (1988), for the same proposition in a case applying Texas law); see also
Coleman v. Cintas Sales Corp., 40 S.W.3d 544, 548 n.1 (Tex. App.CSan Antonio 2001,
pet. denied).  Neither Sims nor Lorenz
describes this characterization of the evidenceCas strong and
substantial, but not conclusiveCas a Apresumption.@[7]  Thus, we disagree with the Eastland Court of
Appeals=s characterization
of such evidence as a presumption.

Here, our review is for legal, not factual,
sufficiency.  Because evidence that GM
complied with NHTSA standards is not conclusive, it cannot render appellees= evidence
insufficient.  See Martinez, 977
S.W.2d at 334.  Thus, regardless of GM=s strong,
substantial evidence of no design defect, we must, under the no-evidence standard
of review, determine whether appellees= design defect
evidence is so weak as to be a mere scintilla or whether it is Asome evidence,@ i.e., more than a
scintilla.  Kindred, 650 S.W.2d at
63.








GM also contends that appellees failed to show that GM=s design was
unreasonable because they failed to take into account the risk of injuries
caused by deployment of the airbag, which GM and appellees refer to as
inflation-induced injuries, and because they failed to offer any evidence that
deploying the airbag at the time of the second impact near Stacey would have
prevented an occupant from hitting the side of the Suburban.  See Coastal Transp. Co. v. Crown
Cent. Petro. Corp., 136 S.W.3d 227, 232 (Tex. 2004); Harper, 61
S.W.3d at 124.








According to Dr. Thomas Perl, GM=s accident
reconstructionist, the eighteen-wheeler initially impacted the Suburban at an
approximately thirty-degree angle at a speed of forty-three miles per hour,[8]
but it was still traveling approximately thirty-nine miles per hour when it
impacted the B-pillar Aflush up against the Suburban,@ which caused a
change in velocity of the Suburban of thirty-one miles per hour.[9]  One of GM=s experts, Daniel
Faust, testified by deposition that the side airbag should deploy when a 3,000
pound object crashed into the Suburban at a ninety-degree angle and a speed of
thirteen to fourteen miles per hour or Aif there=s a severe risk of
injury to the occupant.@ 
The evidence shows that one of GM=s performance
goals was that the side airbag would have a deployment immunity (i.e, it would
not deploy) in a ninety-degree side impact up to 17.5 miles per hour, and this
result was achieved in tests presented to its Performance Assessment Committee
(PAC).  Thus, there is evidence that when
the eighteen-wheeler hit the B-pillar of the Suburban, (1) the front of the
eighteen-wheeler was Aflush@ with the side of
the Suburban and, therefore, the body of the eighteen-wheeler was at a right
angle to the Suburban, (2) that it hit the B-pillar area of the Suburban at a
speed greater than that at which the airbag was designed not to deploy, and (3)
that it hit the B-pillar area of the Suburban at a speed greater than the
thirteen or fourteen miles per hour at which GM=s expert testified
the side airbag should deploy.

Friedman, Mahon, and Robert Caldwell, another of appellees= experts who  reconstructed the accident, testified that
the impact at the B-pillar was sufficiently severe to require deployment of the
side airbag.  The interior of the Suburban
intruded into the passenger compartment about eight to ten inches at the top
and about twelve inches at the level of the window sill.  Rescue personnel had to use the Jaws of Lifeg to get Stacey out
of the Suburban after the accident. 

The foregoing evidence is sufficient to support the
conclusion that the side impact in this case was severe enough that the side
airbag should have deployed and that a side airbag design that did not allow
for the side airbag to deploy in this type of crash was unreasonably dangerous
based on the severity of the crash.








GM contends, however, that it had designed the airbag not
to deploy in an accident like Stacey=s because it was
concerned about inflation-induced injuries and unnecessary deployments.  In May 1999, just a few months before the
2001 Suburban was to go into production, the PAC reviewed the airbag design and
expressed concerns.  Specifically, the
airbag did not timely deploy in a crash test involving a steel pole that
intruded directly into the passenger compartment.  The PAC was also concerned that there was no Adata, analysis,
judgment or rational[e]@ addressing the deployment of side airbags
in Avehicle angle
impacts@ or Aside impacts from
light trucks.@ 
According to the PAC report, such impacts occur at high frequency in the
field. 

The PAC was also concerned about the potential for injury
due to inflation of the side airbags, particularly to children.  Ultimately, the PAC concluded that A[l]ack of
necessary information is responsible for the inability to concur on several of
the evaluation considerations.  However,
performance is the issue in others.  In
particular, the PAC felt the SIAB [side impact airbag] presented additional
risk to small children and from potentially late deployment without any
demonstrate[d] benefit.@ 








Appellees= expert, Mahon,
testified that at the time of the May 1999 PAC report, GM  had two choices with respect to the side
airbag problemsCchange the sensing system or re-evaluate
its deployment goals.  But Mahon also
testified that if GM=s goals were realistic, its only choice
was to change the sensing system. 
According to Mahon, GM=s goals were
realistic, but its engineers declined to change the sensing system because it
would have created a costly delay to the program. 

In an October 1999 PAC report, which was issued after GM
had already put the 2001 Suburban into production, GM ultimately accepted the
slower inflation time in the pole test because the sensing system could not be
adjusted to timely deploy while simultaneously being immune to a door
slam.  In other words, when GM
experimented with making the airbag more sensitive to deployment, the airbag
would deploy in unnecessary circumstances, such as when a door was slammed too
hard.  The PAC report states that A[s]uch a potential
increase in unnecessary deployments would be inappropriate because it would
increase possible exposure to inflation[-]induced injuries.@  According to Mahon, when GM Adrove up the
calibrations to avoid the door slam, [it] ended up with late deployments on the
pole crash.@ 
However, Faust explained that the crash in the pole test was unlike the
crash here because the pole, being extremely narrow, slices into the vehicle
and causes much more intrusion. 








The October 1999 PAC report also shows that in response to
the PAC=s earlier concern
about side impact crashes between the Suburban and light trucks, A[a]n explanation
was provided . . . .  This crash sensing
system evaluation was judged from the harder to sense FMVSS 214 barrier
impacts.@  According to Mahon, the FMVSS 214 test is a Amoving to
formidable barrier@ test, which was designed to be a test in
which the sensor does not deploy.  Mahon
could not understand how running a test in which the airbag specifically does
not deploy would address the PAC=s concerns about
the timing of deployment in a collision in which the airbag was supposed to
deploy.  According to Mahon, the test
presented to the PAC in October Adoesn=t matter.@ 

The October 1999 report also shows that GM=s engineers
declined to perform an angled impact crash test because it was only required in
Europe.  Mahon testified that the crash
in this case was an angled impact and that data says that angled impacts
account for Asomething like 30 percent@ of side impacts. 








The trial court admitted evidence that there was only a
minimal risk of inflation-induced injury due to deployment of side airbags;
specifically, appellees offered an October 2001 NHTSA study, which identified
no fatalities and only three reports of injuries, two minor, resulting from the
deployments of side airbags as of the date of the study.  A GM internal document calculated this risk
as A0.80 serious
inflation[-]induced injury event per 12 million car years.@  The document also noted that this projection
was Afor unrestrained
or improperly restrained children and is not adjusted for the positive effects
of the warnings and increased public awareness.@ 

Both Friedman and Dr. Carley Ward, appellees= biomechanical
engineering expert, testified that they had not seen any inflation-induced
injuries from side airbags.  Mitchell
Scherba, a GM safety director, also acknowledged that side airbags can be more Abenign@ in larger
vehicles because there is more space between the occupant and the location
where the airbag is mounted.  Moreover,
Mahon testified that Ayou could still have inflation-induced
injuries@ in a wanted
deployment.[10]









Jurors are the sole judges of the credibility of the
witnesses and the weight to give their testimony.  City of Keller, 168 S.W.3d at
819.  We therefore conclude that in
determining whether GM=s design was unreasonable, the jury was
entitled to weigh appellees= evidence of the
benefit of occupant protection from side airbag deployment in a crash of this
type against GM=s evidence of the slight risk of
inflation-induced injury and unwanted deployment and to determine based on that
evidence that a design which favored the reduction of the slight risk of
inflation-induced injury and unwanted deployment over occupant protection was
unreasonable.[11]

Based on the foregoing evidence, we conclude that appellees
introduced more than a scintilla of evidence that the 2001 Suburban had a
design defect that was unreasonably dangerous.

2.       Safer Alternative Design








GM also contends that there is no evidence of a viable
safer alternative design. In addition to proving that a product is unreasonably
dangerous, a plaintiff must prove that (1) there was a safer alternative
design, (2) the safer alternative design would have prevented or significantly
reduced the risk of injury, without substantially impairing the product=s utility, and (3)
the safer alternative design was both technologically and economically feasible
when it left the manufacturer=s control.[12]  Tex.
Civ. Prac. & Rem. Code Ann. ' 82.005(a)-(b); Gen.
Motors Corp. v. Sanchez, 997 S.W.2d 584, 588 (Tex. 1999); Bic Pen Corp. v. Carter, 171 S.W.3d
657, 671 (Tex. App.CCorpus
Christi 2005, pet. filed).  To establish a
safer alternative design, a plaintiff must show that the alternative design
would not, under other circumstances, impose an equal or greater risk of
harm.  Martinez, 977 S.W.2d at
337.  The safety benefits from the
proposed design must be Aforeseeably greater than the resulting
costs, including any diminished usefulness or diminished safety.@  Id.; Costilla v. Crown Equip. Corp.,
148 S.W.3d 736, 739 (Tex. App.CDallas 2004, no
pet.). 








In support of their theory that a safer alternative design
was available for the system, appellees Aproposed the
addition of a second side airbag sensor to be used alone or, optimally, in
combination with inflatable head protection.@  GM contends that there is no evidence that
the alternative system proposed by appellees would have Acommanded
deployment in time to cushion [Stacey=s] collision with
the B-pillar.@  GM
also contends that the testimony of Friedman and Mahon with regard to Mahon=s proposed
two-sensor system was conclusory and speculative and not based on any tests,
studies, data, or other scientific support. 
See Earle v. Ratliff, 998 S.W.2d 882, 890 (Tex. 1999) (AAn expert=s simple ipse
dixit is insufficient to establish a matter; rather, the expert must explain
the basis of his statements to link his conclusions to the facts.@); Gammill,
972 S.W.2d at 726-27; see also Coastal Transp. Co., 136 S.W.3d at
232.  Specifically, GM complains that the
evidence shows that the two-sensor system had never been implemented on an
actual vehicle and no manufacturers had ever purchased the two-sensor system
developed by Mahon=s former employer. 

Friedman, Mahon, and Dr. Ward all testified that a timely
deployed side airbag would have prevented or reduced the risk of Stacey=s injuries.  Mahon opined that the airbag did not deploy
here because GM chose a system with only one sensor to pick a calibration that
would achieve door slam immunity even though it would not meet the requirements
for a lot of potential crashes.  Mahon
theorized that a second sensor located in the B-pillar would Amake the sensing
system twice as smart@ by accurately and timely detecting events
calling for Awanted deployments.@  Mahon thus concluded that a two-sensor system
would have timely deployed in Stacey=s accident. 

Mahon testified that Asomething that we
knew about in the late 1980s from frontal crashes, is that when you don=t get enough
information in a crash . . . if you add another sensor, you now have two
devices gathering information, two devices able to think about what=s going on, so you=re twice as smart.@  Mahon testified that when another sensor is
added to the system, there is better deployment on the Amust deploy@ crashes and
better immunity to the Amust not deploy@ crashes. 








To support his theory that a timely deployed airbag would
have prevented Stacey from hitting the B-pillar, Mahon testified in conjunction
with a video of a GM crash test in which a fourteen inch steel pole struck the
door of a vehicle at eighteen miles per hour. 
In that test, the airbag was able to timely inflate and protect the
crash test dummy from the pole because the sensor was properly calibrated to
timely deploy.  According to appellees,
if a single sensor can sense and timely deploy in that test, then it is logical
that a second sensor located in the B-pillar would also Acommand timely
deployment@ when being impacted by an eighteen
wheeler going thirty-nine miles per hour. 
The record supports appellees= contention.








According to the reconstruction performed by CaldwellCGM=s accident reconstruction
expertCStacey=s head was
approximately five and one-half inches from the B-pillar at sixty milliseconds
after the initial impact between the eighteen-wheeler and the Suburban, and it
struck the B-pillar at the earliest at ninety milliseconds after impact.  Caldwell stated that these were conservative
estimates and that a head attached to a body would travel toward the B-pillar a
little slower than the free particle upon which he based his conclusion.[13]  The eighteen wheeler impacted the B-pillar at
thirty to fifty milliseconds.  According
to Caldwell, when the Suburban rotated around into the front of the
eighteen-wheeler, the B-pillar was directly impacted. 

Using Caldwell=s measurements,
Mahon opined that a properly designed sensor in the B-pillar would have
detected the impact, commanded deployment, and caused the airbag to inflate in
approximately ten milliseconds.  Thus, at
sixty milliseconds into the accident, Stacey=s head would have
been about five inches from the B-pillar, enough clearance for the airbag to
inflate between her body and the side of the Suburban. 








Mahon testified in detail about a two-sensor system and
stated that it provides better deployment in crashes in which deployment is
necessary and also better immunity from unwanted deployments.  He described how having a sensor in the
B-pillar works together with the more forward sensor in the door  to provide Abetter
decision-making, [and] better discrimination.@  According to Mahon, Adoor slam immunity
is trivial@ with a two-sensor system because the two
sensors detect opposite impacts and Ahave to come together@ on a deployment
decision.  Thus, you would have a much
better chance of deployment in a crash like this one in which the initial
impact was a little bit off (i.e., not at a ninety-degree angle).  We believe that Mahon sufficiently explained
the basis for his testimony about how a two-sensor system would work based on
his experience in developing frontal side airbag sensors as well as side airbag
sensors.  That the two-sensor system had
not been used on other vehicles in production does not render Mahon=s testimony
speculative or conclusory.  Cf. Norman,
104 S.W.3d at 606 (holding that to prove safer alternative design, technology
must be in existence or scientific knowledge to produce it must be reasonably
achievable).

Friedman explained that the purpose of the sensor is to
detect Athe acceleration .
. . of the surface to which it=s attached.@  The change in acceleration indicates a crash
is occurring, and the sensor then sends a signal to the airbag inflator to
deploy.  Thus, even though the initial
impact was not near Stacey, if a sensor had been located in the B-pillar, it
would have recognized that the vehicle was being pushed and detected the
acceleration that caused Stacey to move toward the B-pillar.  Thus, Friedman=s testimony is
consistent with Mahon=s.








Mahon compared videotapes from two GM crash tests:  one in which an airbag timely deployed and
one in which an airbag did not timely deploy. 
Mahon testified that these tests show that a timely deployed side airbag
can hold an occupant away from intrusion and dramatically reduce head
injuries.  Dr. Ward also used videos from
GM crash tests to show how a properly inflated side airbag will keep a person=s head away from
the interior of the vehicle.  Based on
these test results and their experiences, both Mahon and Dr. Ward concluded
that a timely deployed side airbag would have been out, inflated, and available
for the protection of Stacey=s head.  And Dr. Ward stated that if the airbag had had
head protection, it would have kept Stacey=s head even
further away from the B-pillar. 

Dr. Ward testified that if the existing thorax bag had
inflated, it would have tended to keep Stacey away from the B-pillar and when
she reached it, she would have hit it with less force.  Even an inflated airbag with only thorax
protection keeps the head further inboard than if an airbag had not been
there.  According to Dr. Ward, the existing
thorax bag may not have kept Stacey=s head from
hitting the B-pillar altogether, but it would have prevented her from having
irreversible brain injury because she would have hit it with less force.  Additionally, Dr. Ward explained that an
airbag absorbs energy. 








Dr. Ward also testified that in all of her experience, she
had never seen, and was not aware of, any problems with inflation-induced
injuries from side airbags.[14]  She also testified that her research on
alternatively designed airbags, i.e., side curtain airbags and other airbags
with added head protection, shows that there is no inflation-induced injury
risk with those designs, including with alternative airbags designed by
GM.  See Martinez, 977 S.W.3d at
338 (holding that defendant=s evidence of a
greater risk of harm was not conclusive; thus plaintiff=s evidence created
a fact issue for the jury to resolve).

Based on the foregoing, we conclude that there is at least
some evidence, more than a scintilla, of the existence of a safer alternative
design.[15]  Having determined that the evidence is
legally sufficient to support the jury=s finding that the
Suburban possessed an unreasonably dangerous design defect and that a safer
alternative design existed, we overrule GM=s second issue.








C.  Causation

GM contends in its first
issue that even if there is sufficient evidence to support the jury=s determination that the Suburban suffered from a design defect, there
is no evidence that the defect proximately caused Stacey=s injuries.  Specifically, GM
contends that the testimony of appellees= biomechanical expert, Dr. Ward, is conclusory, speculative, lacks
probative value on its face, and is not grounded in the methods and procedures
of science.  GM=s first three contentions are determinable on the face of the record.

1.     Probative Value of Dr. Ward=s Testimony








Dr. Eugene
George, Stacey=s doctor
while she was at the hospital after the accident, testified that as a result of
the accident, Stacey had a right occipital condyle fracture,[16]
multiple facial fractures on her left side underneath her eye and on her nasal
bone, a dilated, fixed (or Ablown@) right
pupil, a diffuse axonal injury to her brain stem, damage to the frontal lobes
of her brain, and a traumatic subarachnoid hemorrhage.  According to Dr. George, Stacey=s right side injury was consistent with a forceful blow to the right,
back side of the head.   When asked to
explain what had to happen for Stacey to receive those injuries, Dr. George
testified as follows:

This is a complex area when you try to work out
how injuries occur.  In this case you
have an injury to the base of the skull on the right side, and you have
fractures on the left face.  And then you
have some diffuse injuries within the brain in between.  It would appear that she had an injury on one
side and -- and a counter injury that -- that caused her to go forward or
backward on the other.  I think that=s
probably safe to . . . say that . . . it occurred.  The unlikely, [sic] without some sort of a
rotational and flection [sic] injury that she would have that kind of a
occipital skull -- condyle fracture.

 

I guess my only caveat is after seeing a few
decades of these injuries, the brain not only is . . . complex, but it=s in
these complex structures and dura sacs within the brain that it=s
hard to categorize injuries, the rotation, the translational forces and so
forth.  As we try to set up a scenario
for certain injuries, as we try to investigate how we can improve the treatment
of them, it=s
hard even to classify them together . . . . 
Having said that, I would say that this patient had had some sort of . .
. a lateral rotation injury, whether she was struck on this side and went
forward and hit her head on that side -- on the left side or the reverse,
it=d be
a little difficult to say beyond that. 
[Emphasis added.]

 








Dr. Ward testified that
Stacey received her primary head injury from contacting the B-pillar as she moved
back and to the right towards the B-pillar as the Suburban moved out from under
her.  Dr. Ward based her determination by
looking at the Suburban; Stacey=s X-rays, CAT scans, and medical records; Caldwell=s accident reconstruction; and the movements of a human volunteer in
an exemplar vehicle.  She also saw slight
marks on the B-pillar and deformation on the door window on Stacey=s side.  

Dr. Ward testified that the
primary forces in the accident would have moved Stacey to the right and to the
back and that Stacey=s injuries
were consistent with a downward head injury. 
She also testified that she could tell the initial impact with the
B-pillar was the primary force in the accident because Stacey=s CAT scans showed swelling on the right side of her brain.  In addition, Dr. Ward explained that Stacey
could have incurred the left-side injuries much more easily because the eye
socket area is very easy to fracture and this type of impact is
energy-absorbing, i.e., the face breaks to absorb energy and protect the
brain.  Dr. Ward explained that people
can get a lot of facial fractures with no brain injury because the face absorbs
the shock of the blow.  She said that
there was nothing in the event to pull Stacey hard to the left and that GM=s theory that the primary forceful blow was from the left was
inaccurate because human bodies don=t rebound well; a person can=t have a rebound and subsequent impact with more energy than the first
impact.  Dr. Ward admitted that a dummy=s head will rebound in such a circumstance, but that is because the
dummy=s head is made of rubber. 








Dr. Ward theorized that the
left side of Stacey=s face
turned toward the door when the Suburban rolled off the eighteen-wheeler and
spun around and that that caused the injuries to the left side of her
face.  She stated that the only thing
happening after the impact near Stacey was spinning, which would keep Stacey to
the right.  According to Dr. Ward, if
Stacey had rebounded to the left side and hit Carol=s head, Carol would have a corresponding head injury.  Carol was knocked unconscious, but she did
not have any swelling, bruising, or other evidence that she had received a blow
to the right side of her head.   Dr. Ward
agreed that a diffuse axonal head injury is caused by movement of the brain
relative to its attachments. 

GM contends that Dr. Ward=s testimony fails to account for the diffuse axonal injury diagnosed
by Stacey=s own
physician because that type of injury is not caused by a single blow, but by a
rotational movement of the head.  GM also
contends that Dr. Ward=s theory is
based on speculation about how Stacey moved during the accident, rather than
testing, studies, or data.  See
Volkswagen of Am., Inc. v. Ramirez, 159 S.W.3d 897, 912 (Tex. 2004).








According to GM, A[i]t is undisputed that a diffuse axonal injury results when a force
causes a person=s head to
rapidly rotate and whip around.  Ward
never explained what caused [Stacey=s] head to move in that way.@  Appellees contend, however,
that this evidence is not undisputed. 
Rather than confirming that a diffuse axonal injury occurs only from
rapid rotational movement from side to side, Dr. George testified that a
diffuse axonal injury occurs when an impact moves the brain from side to side
or from front to back or any other way. 
He also agreed that Stacey=s brain injury was consistent with a Aheavy blow to the right side and back of [her] head.@  And the excerpt from Dr.
George=s testimony that we previously quoted specifically contemplates Stacey=s head hitting something and then moving forward.  GM=s position also fails to take into account the fact that appellees= experts testified that the Suburban Arapidly rotated@ off of the
eighteen-wheeler, which forced Stacey=s head down to the left and onto the window.  GM=s own expert based his disagreement with Dr. Ward=s theory on his view that a Avery violent motion@ pitched Stacey to the left. 
But the jury was entitled to believe Dr. Ward=s testimony over the testimony of GM=s expert.  See Morrell v.
Finke, 184 S.W.3d 257, 282 (Tex. App.CFort Worth 2005, pet. filed).








Dr. Ward=s conclusions were based on her extensive knowledge about how human
bodies, which she distinguished from crash test dummies in simulated accidents,
move when forces are applied to them. 
She explained how she came to those conclusions based on her examination
of the forces applied in the accident, which she determined in part by
examining the damage to the vehicle and the results of an accident
reconstructionCa common
method of determining after the fact what actually happened during an
accident.  Dr. Ward even explained how it
is impossible to know exactly what happened to a person in an accident because
we cannot perform tests with real people. 
We therefore conclude and hold that her testimony had probative value
and was not speculative.

2. 
Reliability of Dr. Ward=s Testimony

GM also contends that Dr.
Ward=s testimony is unreliable because it fails to account for Stacey=s left-side injuries, the inward forces applied to the B-pillar (i.e.,
the fact that the B-pillar was intruding in on the structure as Stacey was
moving toward it) as evidenced by the leftward (toward the driver=s side) tilting of Stacey=s seat, and Carol=s unconsciousness at the scene.

a.      Standard of Review








Expert testimony must be
relevant to the issues in a case and be based on a reliable foundation.  Tex.
R. Evid. 702; E.I. du Pont de Nemours & Co. v. Robinson, 923
S.W.2d 549, 553 (Tex.1995); Gross, 149 S.W.3d at 237.   The trial court must make an initial
determination of whether the expert=s testimony is relevant and reliable so as to be admissible.  Robinson, 923 S.W.2d at 557;  Gross, 149 S.W.3d at 237.  However, even when challenged expert
testimony is admitted by the trial court, a party may later complain on appeal
that the expert testimony is legally insufficient to support the judgment
because it is unreliable.  Mar.
Overseas Corp. v. Ellis, 971 S.W.2d 402, 409 (Tex.), cert. denied,
525 U.S. 1017 (1998); Gross, 149 S.W.3d at 237.  Unreliable expert testimony is not
evidence.  Merrell Dow Pharms., Inc.
v. Havner, 953 S.W.2d 706, 714 (Tex. 1997), cert. denied, 523 U.S.
1119 (1998).

In determining whether expert
testimony is reliable and, therefore, some evidence supporting the judgment,
the appellate court must employ Aan almost de novo‑like review and, like the trial court, look
beyond the expert=s bare
testimony to determine the reliability of the theory underlying it.@  Austin v. Kerr‑McGee
Refining Corp., 25 S.W.3d 280, 285 (Tex. App.CTexarkana 2000, no pet.); see Guadalupe‑Blanco River Auth. v.
Kraft, 77 S.W.3d 805, 808 (Tex. 2002); Havner, 953 S.W.2d at
713.  AAn expert=s simple
ipse dixit is insufficient to establish a matter;  rather, the expert must explain the basis of
his statements to link his conclusions to the facts.@  Earle, 998 S.W.2d at
890.  The court does not focus on the
correctness of the expert=s opinion,
but on the reliability of the analysis the expert used in reaching his or her
conclusions.  Gross, 149 S.W.3d at
237; State Farm Fire & Cas. Co. v. Rodriguez, 88 S.W.3d 313, 319
(Tex. App.CSan Antonio
2002, pet. denied) (op. on reh'g).

The supreme court has
articulated six nonexclusive factors appellate courts should consider in determining
whether scientific testimony is reliable:

(1) the extent to which the theory has been or
can be tested; (2) the extent to which the technique relies upon the subjective
interpretation of the expert; (3) 








whether the theory has been subjected to peer
review and publication; (4) the technique=s potential rate of error; (5) whether the underlying theory or
technique has been generally accepted as valid by the relevant scientific
community; and (6) the nonjudicial uses that have been made of the theory or
technique.  Havner, 953 S.W.2d at
714; Robinson, 923 S.W.2d at 557.  
Scientific evidence that is not based on Athe methods and procedures of science@ is no more than a Asubjective belief or unsupported speculation.@  Robinson, 923 S.W.2d at
557.  AIf the foundational data underlying opinion testimony are unreliable,
an expert will not be permitted to base an opinion on that data because any
opinion drawn from that data is likewise unreliable.@  Havner, 953 S.W.2d at
714.   In addition, if the expert=s conclusions from data are based upon flawed methodology, the
testimony is unreliable even if the data is sound.  Id.; Gross, 149 S.W.3d at 238.








The Texas Supreme Court has
recognized that the Robinson analysis may not apply to certain types of
expert testimony.  Helena Chem. Co.,
47 S.W.3d at 499 (citing Gammill, 972 S.W.2d at 726); Gross, 149
S.W.3d at 238.  In these types of cases,
there must still be a reliable basis for the expert=s opinion.  Helena Chem. Co.,
47 S.W.3d at 499; Gross, 149 S.W.3d at 238.  AExperience alone may provide a sufficient basis for an expert=s testimony@ unless
there is Atoo great an
analytical gap between the data and the opinion proffered.@  Gammill, 972 S.W.2d at
726‑27.  Thus, regardless of
whether the Robinson factors are applied, the proponent of the expert
testimony must prove that it is based upon a reliable foundation.  Gross, 149 S.W.3d at 238.

b.     Analysis

GM contends that Dr. Ward=s testimony about how Stacey=s body and head moved during the accident is based on mere speculation
about how Stacey moved in the accident and fails to close the analytical gap
between Dr. Ward=s opinion
and the evidence.

Dr. Ward testified about her
qualifications and background at trial. 
A biomechanical engineer, Dr. Ward had been working and determining how
people got hurt in crashes for thirty-eight years.  She had a bachelor=s degree in mechanical engineering, a master=s degree in engineering mechanics, and a Ph.D. in biomechanics and
dynamics.  She also attended medical school
at UCLA for Aa number of
years@ to study the structure of the human body. 








Dr. Ward testified that after
she received her master=s degree,
she Abegan to specialize in the study of dynamics, how things respond on
impact.@  She worked in the auto
industry after that and Autilized the
dynamics of impact of structures at that time.@  Dr. Ward had also taught
engineering and taught medical students how to investigate how injuries
occur.  Dr. Ward had been on a national
committee for the Department of Transportation Alooking at how people are injured in car crashes@ and had served on other similar committees:  A[o]n identifying injuries, on doing autopsies, [and] how to identify
the injuries in the autopsy.@  Dr. Ward had also served for
ten years as the deputy coroner at USC medical school. 

Dr. Ward testified that she
had published peer-reviewed literature about how to investigate how head
injuries occur and that she had written about fifty papers.  Moreover, she answered AYes@ when asked
if she had developed Ascientific
models to absolutely determine reasonably what happened to people and how their
head injuries occurred@ and whether
such models were used by engineers in the field. 








GM first claims that Dr. Ward=s testimony about Stacey forcefully hitting the B-pillar is
suspect.  GM claims that Dr. Ward
testified that Stacey=s head moved
downward and the B-pillar hit her on the top of the head.  But Dr. Ward testified that the right side of
Stacey=s head was impacted toward the back and just above her right ear.  GM also criticizes Dr. Ward=s testimony that swelling on the right side of Stacey=s head was an indication that the B-pillar hit Stacey on the right
side of her head because the swelling was not identified until the day after
the accident.  Dr. Ward explained that
such swelling does not always occur at the point of impact on the same day; it
can occur up to twelve to twenty-four hours after impact.  In addition, the EMT report taken on the day
of the accident indicates external head injuries on Stacey=s right side.

GM also contends that Dr.
Ward failed to account for the left-side fractures to Stacey=s face and that her testimony that after Stacey=s head hit the B-pillar, she went forward and hit the left side of her
face on the windowsill is mere speculation. 
Both Dr. Ward and Friedman testified that the forces applied when the
Suburban started spinning to the right and off the eighteen-wheeler would have
caused Stacey to pull hard to the right against the interior of the
Suburban.  Dr. Ward also found a
one-eighth inch deformation in the trim piece on the top of the windowsill next
to where Stacey had been sitting.  

GM additionally appears to
contend that because its expert concluded that the intrusion of the B-pillar
caused Stacey=s entire
body to move violently to the left (inward toward the center of the vehicle)
and because Dr. Ward did not explain that conclusion, Dr. Ward=s testimony about how Stacey received her left-side injuries is
somehow deficient.  But Dr. Ward,
Caldwell, and Friedman all explained how Stacey=s seat would have moved under her instead of with her.  The jury was entitled to believe appellees= experts over GM=s.  Morrell, 184 S.W.3d at 282.








GM also claims that Dr. Ward
failed to account for Carol=s unconsciousness immediately after the accident.  But Dr. Ward testified that it is not
uncommon for a person to lose consciousness after such an accident even if that
person did not receive a blow to the head. 
Further, GM=s implicit
assertion that if Carol=s
unconsciousness was due to a blow to the head, then that blow could have only
come from Stacey=s head, does
not negate Dr. Ward=s
testimony.  Indeed, Dr. Ward=s testimony that Stacey=s head did not impact Carol=s is supported by the evidence that Carol had no external marks,
bruises, or swelling on her head or any other indication that she had been hit
in the head during the accident. 

GM further contends that Dr.
Ward ignored the fact that Stacey=s seat was tilted inward as a result of the impact.  But rather than ignoring the tilting, as we
have observed above, Dr. Ward testified that Stacey would have moved
independently of the seat because it was moving out from under her and, thus,
Stacey would still have moved the way the forces on her body were moving.  Friedman also agreed that what happened to the
seat had nothing to do with what happened to Stacey even though she was belted
in. 








Finally, GM argues that Dr.
Ward failed to take into account the absence of any head injury to Rachel.  According to GM, Stacey=s injuries are inconsistent with Rachel=s, yet Rachel was on the same side of the Suburban as Stacey, seated
directly behind her.  But Friedman
distinguished their positions.  Rachel
was injured more on the rest of her body because she was seated at the place of
the greatest crush.  Rachel was not
seated where her head could be impacted by, or could impact, the C-pillar.[17]  It is clear from most of the experts= testimony, both appellees= and GM=s, that the
forces applied to Stacey and Rachel were different because of the two-impact
scenario.  Dr. Ward did not find Rachel=s injuries to be a Auseful tool@ in
determining how Stacey received her injuries; thus, her failure to account for
Rachel=s injuries does not show that her testimony was unreliable.

As we have explained above,
Dr. Ward did not fail to account for Stacey=s left-side injuries, the inward forces applied to the B-pillar, or
Carol=s unconsciousness at the scene, as GM contends.  Based on Dr. Ward=s qualifications and experience in the study of how human bodies move
and react when forces are applied to them, we conclude and hold that Dr. Ward=s causation testimony was reliable.

3. 
GM=s Theory of
Causation








In support of its contention
that the evidence is legally insufficient to support the jury=s findings on causation, GM focuses heavily on its own theory of how
Stacey received her injuries:  that
Stacey=s brain injury was caused by impact with Carol=s head rather than any part of the vehicle.  GM=s expert testified at trial that although Stacey initially hit the
right side of her head on the B-pillar, her brain injury was caused when she
rebounded off the B-pillar and hit the left side of her head against Carol=s head.  But as we have already
explained, Dr. Ward also testified as to her theory of how Stacey received her
left-side injuriesCthat after
Stacey hit her head on the B-pillar, the Suburban started spinning, which
forced Stacey=s head to
spin down and hard to the right against the windowsillCand we have determined that Dr. Ward=s testimony was reliable.  It is
the province of the jury to resolve conflicts in the evidence.  City of Keller, 168 S.W.3d at
820.  In addition, as we have already
observed, the jury was entitled to believe the testimony of appellees= expert as to causation over the testimony of GM=s.  See Morrell, 184
S.W.3d at 282.  Thus, GM=s causation evidence does not render appellees= causation evidence legally insufficient.

Based on our review of the
entire record, we conclude that there is more than a scintilla of probative
evidence that a design defect in the Suburban was a proximate cause of Stacey=s injuries.  We overrule GM=s first issue.

IV.  Evidentiary Rulings








In its third
issue, GM contends that the trial court Arepeatedly made evidentiary rulings that paved the way for a plea to
the jury to render a verdict based on emotion, not law or fact.  Independently and cumulatively, these rulings
were reversible error.@  Specifically, GM contends that the trial
court abused its discretion by allowing appellees to introduce the Burry
children to the jury in person, by excluding evidence of Carol=s negligence in causing the accident, by admitting appellees= statistics and excluding GM=s statistics, and by admitting evidence more properly designated as
rebuttal evidence during appellees= case-in-chief.

A.  Standard of Review

A trial
court=s rulings in admitting or excluding evidence are reviewable under an
abuse of discretion standard.  Nat=l Liab. & Fire Ins. Co. v. Allen, 15
S.W.3d 525, 527-28 (Tex. 2000).  An
appellate court must uphold the trial court=s evidentiary ruling if there is any legitimate basis in the record
for the ruling.  Owens-Corning
Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43 (Tex. 1998).








To determine whether a trial
court abused its discretion, we must decide whether the trial court acted
without reference to any guiding rules or principles; in other words, we must
determine whether the act was arbitrary or unreasonable.  Downer v. Aquamarine Operators, Inc.,
701 S.W.2d 238, 241-42 (Tex. 1985), cert. denied, 476 U.S. 1159
(1986).  Merely because a trial court may
decide a matter within its discretion in a different manner than an appellate
court would in a similar circumstance does not demonstrate that an abuse of
discretion has occurred.  Id.

B.  Introduction of Burry
Children to Jury

GM contends
that the trial court=s error in
allowing appellees to introduce each of the Burry children to the jury caused
irreparable harm.[18]  GM contends that this created an emotional
spectacle in the middle of trial, that the harm is Amanifest to any experienced trial lawyer,@[19] and that such harm cannot be undone because GM Acould not possibly@ conduct an effective cross-examination of ChrisCStacey=s husband
and the children=s fatherCafterwards.  But GM failed to
object to the introduction of the girls to the jury; thus, its complaint is
waived.  See Tex. R. App. P. 33.1(a); Bushell v. Dean, 803 S.W.2d 711,
712 (Tex. 1991) (op. on reh=g).








GM nevertheless contends that
an objection was unnecessary due to the extreme emotional nature of the scene
and the inevitable impact it must have had on the jury.  However, we are unable to determine from the
face of the record the extent to which this might have impacted the jury.  The entire exchange between appellees= trial counsel and Chris as stated in the record is as follows:

Q.  Chris, I would like for your permission just
briefly to introduce - - or for you to introduce your daughters to the
jury.  Is that okay?       

 

A.  It=s
fine with me, sir.

 

Q.  Okay.

 

A.  May I
step down, Judge?

 

THE COURT: 
Yes.

(A brief interruption occurred.  Girls entered courtroom.)

 

Q.  Chris,
if you=d
just briefly introduce them to the jury, and we=ll
let them go.

 

A.  This is
- - This is Meghan, my - - my oldest, who is most like me.

And here are the twins.  And as I said, Rachel, with God=s
little gift to us to tell them apart.

Thank you, girls.

 

Q.  Thanks,
girls.

 

A.  Go on.

(A brief interruption occurred.)

 

Q.  Chris,
you=ve
done a great job of raising those girls.  
I have three of my own, and I=m sure I would never have
been able to do what you=ve
been able to do.

 








Although it appears from the
cold record that the introduction of the girls had the potential to have some
emotional impact on the jury, we do not have the benefit of having witnessed
the entire scene, and what is recorded in the record is not so egregious that
we can say that the trial court abused its discretion, especially in light of
the fact that it appears GM had every opportunity to object and chose not to do
so.  Additionally, we note that the
children, although minors represented by their father as next friend, are also
parties to the lawsuit.  Generally,
parties to a lawsuit are allowed to be in the courtroom at counsel table
throughout the proceeding.  See Tex. R. Evid. 614 (exempting party to
suit from Athe Rule@Cexclusion from courtroom during other witnesses= testimony).[20]

C.  Exclusion of Evidence of Carol=s Negligence








GM also contends that the
trial court abused its discretion by excluding evidence that Carol=s negligence caused not only the accident but also Stacey=s injuries.[21]  Specifically, GM contends that it should have
been able to introduce evidence that Chris testified under oath at a settlement
hearing that he sued Carol for negligence and for causing Stacey=s injuries and that Chris had alleged in prior pleadings that 

24.  Defendant Carol Reid was the operator of the
vehicle and thus owed a duty of ordinary care[;]

25.  Defendant breached her duty of care by not
safely operating the vehicle[; and]

26.  Defendant=s negligence was a proximate cause of Plaintiffs= injuries and resulting damages.  [Emphasis added.]

Thus, GM claims it should have been able to
cross-examine Chris about his suit against Carol and that the trial court
abused its discretion by excluding the pleadings and Chris=s sworn testimony.  GM also
contends that the trial court improperly excluded the testimony of Corporal
Byron Irving, the investigating officer at the scene.  GM proferred Corporal Irving to testify about
how Carol violated the traffic laws by making an illegal and unsafe turn across
two double white lines.  








But the evidence about which
GM complains is cumulative of other evidence. 
See Williams Distrib. Co. v. Franklin, 898 S.W.2d 816, 817 (Tex.
1995).  The parties stipulated to the
jury that Carol Aturned when
it was unsafe, and that was a violation of Texas traffic laws.@  Friedman agreed that Stacey=s injuries would never have occurred but for Carol=s turning in front of the eighteen-wheeler.  And Caldwell stated that he didn=t think there was Aany doubt@ that Carol=s conduct caused the accident. 
He also said that AI think that
she definitely turned across in front of the semi truck.@  Contrary to GM=s contentions, this cumulative evidence does not simply show that
Carol=s conduct contributed only to the accident and not Stacey=s injuries; without the accident, there would have been no injuries
whatsoever.  In addition, appellees never
contended that GM was the sole cause of Stacey=s injuries; the charge asks in Question No. 3:  ADid the negligence, if any, of Carol Reid proximately cause the injury
in question?@  The jury answered AYes.@  It is clear that appellees were suing Carol,
as well as GM, for causing Stacey=s injuries.  Thus, admitting
Chris=s deposition testimony and pleadings, and additional evidence of the
investigating officer=s report of
how Carol turned in front of the eighteen-wheeler, was unnecessary.  See id.








GM also contends that
although the jury found that Carol was fifty-one percent responsible for Stacey=s injuries, with the addition of the complained-of evidence, the jury
could have found that Carol was eighty percent responsible or more.  But we cannot engage in that kind of
speculation about what the jury would have done, nor does GM present any
evidence to show that the jury would have found Carol more at fault if the
trial court had admitted additional, more detailed evidence of her negligence.[22]  We hold that the trial court did not abuse
its discretion by excluding this evidence.

D.  Statistics

GM contends that the trial
court abused its discretion by admitting appellees= statistical evidence of other accidents as proof that the Suburban
contained a design defect and by excluding GM=s evidence about the Areal-world@ performance
of the Suburban as compared to other vehicles. 
Appellees contend that their statistics were not introduced for the
purpose of proving that the Suburban had a design defect and that GM=s statistics could not be used to prove that there was no design
defect because they did not take into account reasonably similar vehicles and
circumstances.








Specifically, GM complains
about the admission of the following evidence of other accidents because appellees
did not show Athat the
accidents were reasonably similar to@[23] Stacey=s or that
the vehicles were similar to the 2001 Suburban: 
an Insurance Institute for Highway Safety analysis of side impact
collisions stating that from 1993 through 1996 there were 8,554 side impact
fatalities, 3,000 to 5,500 side impacts with fatal head injuries, 35,800 side
impacts with head injuriesCincluding 15,000 from contacts with an interior pillar, and 602
fatalities that could have been prevented with side impact airbags with head
protection; and a NHTSA statistic showing that 6,000 head injuries were caused
by contact with the vehicle interior in side impact collisions.  GM also claims that appellees were allowed to
Amisleadingly attribute those statistics to the proposed designs.@ 

The evidence which GM
complains was improperly excluded is a risk analysis performed by Dr. Michelle
Vogler, which compares the 2001 Suburban to other vehicles, regardless of
differences in design or accident circumstances.  Dr. Vogler acknowledged that her analysis was
not based on reasonably similar vehicles and events.








Regardless of whether the
trial court abused its discretion in admitting appellees= evidence and excluding GM=s, we hold that such an error would not be reversible.  To obtain reversal of a judgment based upon
the admission or exclusion of particular evidence, the appellant must show that
any error in admitting or excluding the evidence was reasonably calculated to
cause and probably did cause rendition of an improper judgment.  Tex.
R. App. P. 44.1;  Gee v.
Liberty Mut. Fire Ins. Co., 765 S.W.2d 394, 396 (Tex. 1989); Bartosh v.
Gulf Health Care Center-Galveston, 178 S.W.3d 434, 439 (Tex. App.CHouston [14th Dist.] 2005, no pet.). 
To establish harm (i.e., that the error was reasonably calculated to
cause and probably did cause rendition of an improper judgment) as to the
exclusion of evidence, the appellant must demonstrate that the excluded
evidence was both controlling on a material issue and not cumulative of other
evidence.  Williams Distrib. Co.,
898 S.W.2d at 817; Bartosh, 178 S.W.3d at 439.








Here, regardless of the
purpose for which appellees proferred their statisticsCas background about the general risk and severity of side impacts or
as evidence of a design defectCthere was other legally sufficient evidence of design defect to support
the jury=s verdict.  See supra
section III.B.2.  Moreover, GM=s Arebuttal@ evidence was not admissible on the issue of design defect because it
did not compare reasonably similar vehicles and events.  Thus, we conclude that the trial court did
not reversibly err by excluding GM=s statistics and admitting appellees=.  See Nissan Motor Co.,
145 S.W.3d at 138-39; Martinez, 977 S.W.2d at 340-41.

E.  Rebuttal Evidence

GM finally
claims that the trial court abused its discretion by allowing appellees to
introduce evidence in their case-in-chief that was more properly characterized
as rebuttal evidence.  But GM did not
object to the admission of this evidence on those grounds.  Thus, its complaint is waived.  See Tex. R.
App. P.
33.1(a); Bushell, 803 S.W.2d at 712.

Having determined that the
trial court did not abuse its discretion with respect to GM=s complained-of evidentiary rulings, we overrule GM=s third issue.

V.  Juror Issues and Jury
Instructions

In its fourth
issue, GM contends that some jurors were biased and unqualified and that the
jury was improperly instructed.  More
specifically, GM claims that the trial court should have excluded two jurors
for cause because they both stated they had lost loved ones in accidents, that
the trial court erred by instructing the jury that damages should not be
reduced based on Carol=s
negligence, and that the trial court should have instructed the jury that the
Suburban should be presumed not to be defective.

A.  Alleged Juror Bias








GM contends that the trial
court should have excluded two veniremembers for cause.  One veniremember said that his brother had
been killed in a car accident the previous year and that he had been involved
in Aa fight@ with
GM.  Another veniremember stated, AI don=t really
think I can,@ when asked
whether she could set aside her sympathies for appellees because she had a
relative who had been killed in a car wreck due to head injuries. 

A person who is biased or
prejudiced against a party or a type of claim is disqualified to serve on a
jury.  Tex.
Gov=t Code Ann. ' 62.105(4) (Vernon 2005); Hyundai Motor Co. v. Vasquez, 189
S.W.3d 743, 749 (Tex. 2006).  Bias is Aan inclination toward one side of an issue rather than to the other .
. . .  [I]t must appear that the state of
mind of the juror leads to the natural inference that he will not or did not
act with impartiality.  Prejudice . . .
means prejudgment, and consequently embraces bias.@  Hyundai Motor Co., 189
S.W.3d at 751 (quoting Compton v. Henrie, 364 S.W.2d 179, 182 (Tex.
1963)); Hafi v. Baker, 164 S.W.3d 383, 385 (Tex. 2005).  The relevant inquiry is not where the juror
starts but where he or she is likely to end. 
Hafi, 164 S.W.3d at 385.








A juror is disqualified as a
matter of law if the juror unequivocally cannot be fair and impartial because
the juror=s feelings
about a party or type of claim are so strong that the juror=s verdict will be based on those feelings and not on the
evidence.  Buls v. Fuselier, 55
S.W.3d 204, 210 (Tex. App.CTexarkana 2001, no pet.).  An
equivocal expression of bias, however, is not grounds for disqualification as a
matter of law.  Cortez v. HCCI-San
Antonio, Inc., 159 S.W.3d 87, 94 (Tex. 2005).

If a juror=s bias or prejudice is established as a matter of law, the trial court
has no discretion and must disqualify the juror.  See id. at 93; Malone v. Foster,
977 S.W.2d 562, 564 (Tex. 1998).  If a
juror=s bias or prejudice is not conclusively established as a matter of
law, we review the trial court=s decision on a challenge for cause for an abuse of discretion.  Cortez, 159 S.W.3d at 93.  In determining whether the trial court abused
its discretion, we must review the entire examination of the juror.  Id. 
Because the trial judge is actually present during voir dire, he or she
is Ain a better position . . . to evaluate the juror=s sincerity and . . . capacity for fairness and impartiality.@  Id. (quoting Swap
Shop v. Fortune, 365 S.W.2d 151, 154 (Tex. 1963)).  AIt can be a close question whether a juror=s response indicates a prejudice due to personal animus or bias,
rather than a fair judgment of the previewed evidence.@  Hyundai Motor Co., 189
S.W.3d at 754.








In response to questioning,
veniremember 10 said that his brother had been killed in a car wreck the year
before trial and that Aall -- us
and GM and all them, they had a fight about that, so I won=t get into all that, but I wouldn=t -- I wouldn=t want to
sit on a case like this, if I could get out of it.@  When asked if he would be for
or against GM, veniremember 10 said, AI have no idea.  I just listened
to the case.  I sat there -- went through
it one time with my brother, listened to it, and I=d probably -- I couldn=t tell you which way I would be.@  Nothing in veniremember 10=s equivocal response indicates that he had any inclination for or
against GM, i.e. bias, or that he had prejudged any aspect of the case, i.e.,
prejudice.  We hold that the trial court
did not abuse its discretion by denying GM=s challenge for cause of veniremember 10.

Veniremember 17 stated that
her Adaughter=s baby
half-sister was killed in a wreck due to head injuries.@  In response to a question from
GM asking whether any of the veniremembers would have Aa problem with sympathy in the [Burry] family . . . and putting that
aside in dealing with the facts of the airbags in this case,@ veniremember 17 stated, AI will have, because I see what my daughter and her family went
through when that happened to her sister. 
It was a serious head injury.@  GM=s counsel then asked, AAnd because of your experience with that understandably, you=re not going to be able to put that aside -- put that sympathy aside
and make a decision based solely on the evidence in this particular case?,@ to which veniremember 17 responded, AI don=t really
think I can.@ 








When GM challenged
veniremember 17 for cause, the trial court observed, AShe said I don=t think I
can.  She never said she couldn=t.@  Although veniremember 17=s responses can be interpreted as indicating that she could not set
aside her sympathy for appellees because of her prior experiences, the words
she used were also equivocal.  Because we
were not in a position to observe veniremember 17 as the trial court was, we
know nothing about her demeanor, expressions, tone, or vocal inflection when she
stated those words; on their face, they do not conclusively show bias or
prejudice.  The trial court=s observation appears to indicate that veniremember 17 was
equivocating when she gave her response. 
Thus, we cannot hold that the trial court abused its discretion in
denying GM=s challenge
for cause to veniremember 17, even if we might have come to a different
conclusion.

B.  Sufficiency of Evidence Supporting Bystander
Damages








In its fourth issue, GM also
claims the trial court erred by instructing the jury, over its objection, that
it could award Chris, as next friend for Rachel, Sarah, and Meghan, bystander
damages for mental anguish suffered by the girls as a result of witnessing the
accident and Stacey=s injuries
because this is a strict liability design defect case, as opposed to a
negligence case.  But in a subissue of
its fifth issue, GM also challenges the sufficiency of the evidence to support
such damages.  Because GM=s sufficiency challenge is potentially dispositive, regardless of
whether such damages are even available here, we will address that subissue
first.

GM contends that there is no
evidence or factually insufficient evidence to support the jury=s verdict on bystander damages because none of the girls testified,
and no one else testified, about the girls= reactions as bystanders to the accident and Stacey=s injuries.  Although other
witnesses testified about the effect that Stacey=s subsequent mental impairment had on the girls, GM contends that this
evidence is insufficient to support the award of bystander damages to the
girls.  

To recover as a bystander,
the plaintiff must establish the following:

(1) The plaintiff was located near the scene of
the accident, as contrasted with one who was a distance away from it;

 

(2) The plaintiff suffered shock as a result of a
direct emotional impact upon the plaintiff from a sensory and contemporaneous
observance of the accident, as contrasted with learning of the accident from
others after its occurrence; and

 

(3) The plaintiff and the victim were closely
related, as contrasted with an absence of any relationship or the presence of
only a distant relationship.

 








United Servs. Auto. Ass=n v. Keith, 970 S.W.2d 540, 541‑42
(Tex. 1998); Lions Eye Bank of Tex. v. Perry, 56 S.W.3d 872, 878 (Tex.
App.CHouston [14th Dist.] 2001, pet. denied).  Texas law requires the bystander=s presence when the injury occurred and the contemporaneous perception
of the accident.  Keith, 970
S.W.2d at 542; Lions Eye Bank, 56 S.W.3d at 878. 

GM=s sufficiency challenges appear to relate to the second element of
bystander damages, that the plaintiff suffered shock as a result of the direct
emotional impact from a sensory and contemporaneous observance of the
accident.  GM claims that there is no
evidence that the girls actually saw Stacey=s head hitting the B-pillar and that there is no evidence of the girls= reactions to the accident as opposed to the later manifestations of
Stacey=s injuries.








The driver of the
eighteen-wheeler testified that when he got out of his truck after the
accident, the lady on the passenger side in the front seat was unconscious, and
the little girl in the back seat was crying.[24]  A witness who saw the accident in his
rearview mirror testified that when he turned around and went back to the
Suburban, one of the little girls Aseemed fine,@ one Aacted out of it,@ and the
other was screaming.  The girls= counselor testified that they were traumatized initially when she
first began treating them but that was because they did not know if their
mother was going to live or die and A[t]o deal with that trauma with them was the first initial shock.@  We find no evidence in the
record specifically describing the girls= mental and emotional reactions to the accident itself.

Appellees contend that the Ashock@ and Adirect emotional impact@ elements of a bystander recovery cause of action can be inferred from
the fact that a bystander observes an accident and injury sensorily and
contemporaneously.  See Dawson v.
Garcia, 666 S.W.2d 254 (Tex. App.CDallas 1984, no writ).  The
issue in Dawson, however, was whether two children who were knocked
unconscious in an automobile accident in which their father sustained injuries
that killed him could be said to have contemporaneously perceived the
accident.  Id. at 258.  Whether or not the record supported a finding
that the plaintiffs in that case suffered shock and direct emotional impact as
a result of their Aexperiential
perception@ of the
accident and their father=s injuries
was not at issue.  See id. at
260.  Thus, we decline to extend the
holding of Dawson as advocated by appellees.








In other bystander cases,
there was also evidence introduced at trial establishing the nature and extent
of the shock and emotional impact suffered by the bystander as a result of
perceiving a family member=s injury in an accident.  See,
e.g., Gen. Motors Corp. v. Grizzle, 642 S.W.2d 837, 843-44 (Tex. App.CWaco 1982, writ dism=d); Landreth v. Reed, 570 S.W.2d 486, 488 (Tex. Civ. App.CTexarkana 1978, no writ); Dave Snelling Lincoln-Mercury v. Simon,
508 S.W.2d 923, 925-26 (Tex. Civ. App.CHouston [1st Dist.] 1974, no writ). 
Here, there is no such evidence; the only evidence about the emotional
impact on the girls relates to their post-accident fears about their mother=s survival and their diminished relationship with her afterwards.  Thus, although we believe that GM is
incorrect in its assertion that there is no evidence that the girls Aexperientially perceived@ the accident and Stacey=s injuries, we conclude that the evidence is legally insufficient to
support the jury=s findings
on bystander damages because there is no evidence that the girls experienced
shock and direct emotional impact as a result of witnessing the injury to
Stacey at the time of the accident.  We
therefore hold that there is legally insufficient evidence to support the jury=s award of bystander damages to the three girls.

Because there is no evidence
to support such a damages awardCregardless of whether such damages could be awarded in a strict
liability cause of actionCwe need not
address GM=s subissue
regarding the availability of such damages. 
See Tex. R. App. P.
47.1; Tex. Mut. Ins. Co. v. Surety Bank, N.A., 156 S.W.3d 125, 131 n.4
(Tex. App.CFort Worth
2005, no pet.)








C.  No-Reduction-of-Damages
Instruction

GM also
claims that the trial court erred by instructing the jury that it should not
reduce appellees= damage
awards because of any negligence of Carol. 
But GM did not object to this instruction until it filed a motion for
new trial.  Thus, GM failed to preserve
this issue for review.  See Tex. R. App. P. 33.1(a); Tex. R. Civ. P. 274; In re W.J.H.,
111 S.W.3d 707, 711 (Tex. App.CFort Worth 2003, pet. denied); see also Osterberg v. Peca, 12
S.W.3d 31, 55 (Tex. 2000) (reiterating prior holding in Holland v. Wal-Mart
Stores, Inc., 1 S.W.3d 91, 94 (Tex. 1999), that when trial court must
resolve legal issue before jury can properly perform its fact finding role,
party must object in time for trial court to make appropriate ruling without
having to order new trial), cert. denied, 530 U.S. 1244 (2000).

D.  Rebuttable Presumption Instruction








GM argues that the trial
court erred by refusing to instruct the jury that Athe law presumes that the 2001 Chevrolet Suburban was not defective@ because it complied with governmental regulations regarding side airbags.  But as we have already discussed in section
III.B.2.b.1 of this opinion dealing with evidence of a design defect, no such
presumption arose; rather, this evidence is only considered to be strong and
substantial, not conclusive.  Moreover,
no presumption arose under section 82.008(a) of the civil practice and remedies
code because it applies only to suits filed on or after July 1, 2003 and this
suit was filed May 28, 2003.  See
Act of June 2, 2003, 78th Leg., R.S., ch. 204, ' 5.02, 2003 Tex. Gen. Laws 847, 861-62, 899.  Thus, the trial court did not err by refusing
to include a rebuttable presumption instruction in the charge.

We overrule GM=s fourth issue, but we sustain that portion of GM=s fifth issue challenging the legal sufficiency of the evidence to
support the jury=s bystander
damage awards.

VI.  Damage Awards

In the remainder of its fifth
issue, GM contends that parts of the jury=s $38 million damage award are unsupported by either legally or
factually sufficient evidence, or both. 
According to GM, the damage awards should be eliminated or substantially
reduced.

A.  Standard of Review

We apply the same no-evidence
standard of review to legal sufficiency challenges to the evidence supporting a
jury=s damage award as we do to a legal sufficiency challenge on a jury=s liability findings.  See
HCRA of Tex., Inc. v. Johnston, 178 S.W.3d 861, 868, 872 (Tex. App.CFort Worth 2005, no pet.); see also supra section III.A.








The standard of review for an
excessive damages complaint is factual sufficiency of the evidence.  See Mar. Overseas Corp., 971 S.W.2d at
406; Morrell, 184 S.W.3d at 288 n.33. 
An assertion that the evidence is factually insufficient to support a
fact finding means that the evidence supporting the finding is so weak or the
evidence to the contrary is so overwhelming that the answer should be set aside
and a new trial ordered.  Garza v.
Alviar, 395 S.W.2d 821, 823 (Tex. 1965). 
We are required to consider all of the evidence in the case in making
this determination, not just the evidence that supports the finding.  Mar. Overseas Corp., 971 S.W.2d at
406-07.

B.  Parental Consortium Awards

GM next
contends that the award of $1,010,000 to each of the girls for loss of parental
consortium is excessive in comparison to awards that the supreme court and this
court have affirmed in cases in which Athe parents were equally if not more disabled and limited in their abilities
to interact.@  Thus, GM contends that the awards should be
limited to $200,000 for each of the girls.

The Texas Supreme Court does
not conduct factual sufficiency reviews. 
See City of Keller, 168 S.W.3d at 822.  Thus, in the Reagan case cited by GM,
the supreme court did not review the factual sufficiency of the evidence to
support the amount of the parental consortium damages awarded but merely the
plaintiffs= entitlement
to those damages.  See Reagan v.
Vaughn, 804 S.W.2d 463, 465-67 (Tex. 1990). 









This court has reviewed the
sufficiency of such damages for children in a case in which their father
received a head injury as a result of a traffic accident.  Rendon v. Avance, 67 S.W.3d 303,
314-16 (Tex. App.CFort Worth
2001, pet. granted, judgm=t vacated
w.r.m.).  But except for the similarity
in family relationships and the type of injury sustained, the facts in that
case are distinguishable from the facts here. 
In Rendon, the children=s father was not their primary caregiver before the accident, and the
evidence showed as follows:  

At the time of trial in October 1998, Robert=s
condition had improved, and he was able to hold down a position working with
people suffering from chronic pain.  His
anxiety, debilitating migraine headaches, and depression continue, however, and
he will have these problems and need medical care for the rest of his
life.  

Id. at
316.  Thus, Rendon may be
distinguished on its facts.








The factors that the jury may
consider in determining the amount of loss of parental consortium damages
include, but are not limited to, the severity of the injury to the parent and
its actual effect upon the parent‑child relationship, the child=s age, the nature of the child=s relationship with the parent, the child=s emotional and physical characteristics, and whether other consortium‑giving
relationships are available to the child. 
Reagan, 804 S.W.2d at 467. 
The evidence showed that at the time of trial Meghan was eleven and
Rachel and Sarah were nine.  Stacey had
quit work when Meghan was born and home-schooled the children.  However, Chris and Stacey had discussed
putting the girls in school and Stacey going back to work in fall 2003.

Stacey was in a coma for
approximately ten weeks.  While Stacey
was in the hospital, Chris had to balance visiting her and taking care of the
girls, who were Aemotionally
a wreck.@  At the time, Rachel was in a
wheelchair.  Stacey was in a
rehabilitation facility until March 2004, over a year after the accident. 

The girls= therapist, Mary Lee, testified that before the accident, the girls= Awhole lives,
other than their dad . . . , was wrapped up in mom.  She was school.  She was mom. 
She was discipline. . . . [S]he took them everywhere . . . .  So it was like that they lost, you know, 60
percent of their world almost in that.@  After the accident, A[t]hings were not at all like they were.  Mom came with an entourage.  She came with therapists.  She came with people to help her.  She had round-the-clock help in all areas.  And they could barely have access to mom.@ 

At the time of trial, Stacey
had improved physically in that she could eat and use the bathroom
independently.  But Stacey had trouble
seeing, and light bothered her because one of her eyes was dilated.  Her speech was strange.  She could walk, but she had very little
flexibility and could lose her balance.  








Stacey=s brain injury caused her to lose the ability to function in an
unstructured environment.  Stacey=s rehabilitation therapist stated that things had to be very
structured for Stacey, Aa little,
sort of, narrow world.@  Stacey was impulsive and had unpredictable
emotional outbursts, which frightened the children.  When Stacey Aha[d] that impulse to say something negative, hurtful, or even curse,
use an expletive, she just sa[id] it.@  Her impulsivity made her Alike a kid.@  Stacey did not behave that way before.  The girls could not converse with Stacey and
were not comfortable with her and with her voice.  Stacey could not read to the girls anymore,
which she used to do every night. 
Because Stacey had trouble functioning, and became disturbed in, an
unstructured, unpredictable, or noisy environment, such as an environment in
which young children are living, and because Stacey needed full-time
supervision, Stacey had to move in full-time with her parents, so she no longer
lived with Chris and the girls.  The girls
visited Stacey, but it was hard for them.








Chris testified that before
the accident AStacey=s relationship with the girls was exceptionally close. . . .  She was the center of their world.  She was their rock.@  He said that all of the girls
had a very hard time dealing with Stacey=s injuries and that they wanted their old mom back.  He said they still woke up in the middle of
the night crying and wondering why this had to happen and saying that they
wanted their mom back.  He said every
time they saw Stacey, their hope was renewed, and every time they were reminded
that Ait=s not mom
the way she was before.@

We hold that the evidence
detailed above supports the jury=s loss of parental consortium damage findings and that those findings
are not excessive.

D.  Damages to Stacey

GM further disputes as
excessive the amounts awarded to Stacey for past and future pain and mental
anguish ($5 million and $10 million, respectively), future medical care ($6
million), lost earning capacity ($600,000), and future physical impairment
($3.5 million) as excessive.

1.     Past and Future Pain and Mental Anguish

GM contends
that the award for past physical pain and mental anguish is excessive because Athe evidence is clear that however severe [Stacey=s] injuries, she was not and will not be in significant pain, nor has
she been or will she be aware of the scope of her injuries.@ 








The process of awarding
damages for amorphous, discretionary injuries such as mental anguish or pain
and suffering is inherently difficult because the alleged injury is a
subjective, unliquidated, nonpecuniary loss. 
HCRA, 178 S.W.3d at 871; Dollison v. Hayes, 79 S.W.3d 246,
249 (Tex. App.CTexarkana
2002, no pet.).  The presence or absence
of pain, either physical or mental, is an inherently subjective question.  HCRA, 178 S.W.3d at 871; Dollison,
79 S.W.3d at 249.  No objective measures
exist for analyzing pain and suffering damages. 
HCRA, 178 S.W.3d at 871; see Hicks v. Ricardo, 834 S.W.2d
587, 591 (Tex. App.CHouston [1st
Dist.] 1992, no writ).  Thus, once the
existence of some pain and suffering has been established, there is no
objective way to measure the adequacy of the amount awarded as
compensation.  HCRA, 178 S.W.3d at
871; Dawson v. Briggs, 107 S.W.3d 739, 751 (Tex. App.CFort Worth 2003, no pet.).








A party may establish the
existence of conscious pain and suffering by circumstantial evidence.  HCRA, 178 S.W.3d at 871; Borth v.
Charley's Concrete Co., 139 S.W.3d 391, 395 (Tex. App.CFort Worth 2004, pet. denied). 
Pain and suffering may be inferred or presumed as a consequence of
severe injuries.  HCRA, 178 S.W.3d
at 871; Borth, 139 S.W.3d at 395. 
The duration of the pain and mental anguish is an important
consideration.  HCRA, 178 S.W.3d
at 871; SunBridge Healthcare Corp. v. Penny, 160 S.W.3d 230, 250 (Tex.
App.CTexarkana 2005, no pet.).  The
jury is given a great deal of discretion in awarding an amount of damages it deems
appropriate for pain and suffering.  HCRA,
178 S.W.3d at 871; Dollison, 79 S.W.3d at 249.   Despite this broad discretion, there must Abe some evidence to justify the amount awarded,@ as a jury Acannot
simply pick a number and put it in the blank.@  Saenz v. Fid. & Guar.
Ins. Underwriters, 925 S.W.2d 607, 614 (Tex. 1996).

As long as sufficient
probative evidence exists to support the jury's verdict, neither the reviewing
court nor the trial court is entitled to substitute its judgment for that of
the jury.  Larson v. Cactus Util. Co.,
730 S.W.2d 640, 641 (Tex. 1987); HCRA, 178 S.W.3d at 871.  A verdict will be set aside on appeal only
where the record clearly indicates that the award was based on passion,
prejudice, or improper motive, or is so excessive as to shock the conscience.  HCRA, 178 S.W.3d at 871-72; Transit
Mgmt. Co. of Laredo v. Sanchez, 886 S.W.2d 823, 826 (Tex. App.CSan Antonio 1994, no writ).

There must also be evidence
that the amount of mental anguish damages awarded is fair and reasonable, and
the appellate court must perform a Ameaningful evidentiary review@ of the amount found.  Saenz,
925 S.W.2d at 614.








GM contends that the evidence
is factually insufficient to support the jury=s damage findings on pain and mental anguish because the evidence
shows that Stacey Awas not and
will not be in significant pain, nor has she been or will she be aware of the
scope of her injuries.@  The evidence shows that when Stacey was first
out of the hospital and in a rehabilitation facility, A[h]er feet had been damaged and atrophied, as well as her arm.@  She had to have intensive
therapy.  By the time of trial, although
Stacey could walk without assistance, her rehabilitation therapist testified
that Stacey had an abnormal gait and weakness on her right side.  She also had stiffness on the right side of
her body.  The therapist also stated that
Stacey had suffered depression and emotional outbursts. 

Jim Reid, Stacey=s father, also testified that one of Stacey=s eyes was extremely dilated as a result of her brain injury and that
she was extremely sensitive to light.  He
stated that Stacey had very little flexibility and walked Aramrod straight@ as if she
was Afused.@  If Stacey bent over, she tended to lose her
balance.  Because Stacey did not get some
of the therapy she needed while she was in a coma, she had to have an operation
on both of her achilles heels. 








Jim discussed the stress
Stacey was under when she first moved home with Chris and the girls.  According to Jim, Athe fact that Stacey was able to recognize where she was now versus
where she was before, put an incredible amount of stress on Stacey.  And we saw her begin to lapse back and not be
able to progress.@  Jim testified that one of the Amost devastating@ things for
Stacey was that Ashe knows
where she was, and it=s very
frustrating . . . and [i]t provokes sometimes anger.@  When this happened, Stacey
knew what she was doing, but she could not stop herself.  She cursed in front of the girls.  Stacey=s father testified that AStacey does not have the mind that she once had, and she knows it.@  Chris testified that Stacey
sometimes asked him, AWhen is the
nightmare going to end?  When am I going
to wake up and everything is going to be okay?@ 

We hold that probative
evidence in the record supports the jury=s damage findings as to Stacey=s past and future pain and mental anguish.

2.     Future Medical Care      








GM contends
that there is no basis of the jury=s award of $6 million for future medical care because appellees
presented no evidence of present value. 
But appellees were not required to introduce such evidence because the
jury was qualified to make the calculation based on its common knowledge of
interest rates.  See Rendon, 67
S.W.3d at 310.  Here, the trial court
instructed the jury to calculate all of the damage awards as a sum Aif paid now in cash.@  We must presume that the jury
followed the trial court=s
instructions.  See id.  Although appellees= medical expense expert testified that he had not attempted to
discount his estimate of $6 million to present value, he also testified that
his estimate was a conservative figure that could be up to $9 million and that
it did not include any increases for rising medical costs.  Thus, the jury could have determined that the
total future medical damages that Stacey would incur were greater than $6
million and that the present value discount was offset by the rising future
costs.

3.     Lost Earning Capacity

GM also
argues that the jury=s award of $600,000
for loss of future earning capacity is insupportable because appellees= life care plan expert, Dr. Carl Hansen, Aoffered only speculation based on [Stacey=s] out-of-date employment history.@  Although Stacey had a master=s degree in public analysis and political science and had worked as a
researcher and account representative for Congressional Quarterly, at the time
of the accident she had not worked in almost ten years because she had not
returned to work after having children. 
However, Stacey and her husband had planned for her to return to work in
late 2003. 








Lost earning capacity is not
measured by what a person actually earned before an injury but by what the
person=s capacity to earn a livelihood actually was even if he or she had
never worked in that capacity in the past. 
Pilgrim=s Pride
Corp. v. Smoak, 134 S.W.3d 880, 900 (Tex.
App.CTexarkana 2004, pet. denied). 
In order to recover diminished earning capacity in a particular
occupation, it is not always necessary for the plaintiff to have been working
in and deriving earnings from that occupation before injury, as long as
earnings from that occupation would provide a true measure of that plaintiff=s earning capacity.  Id.  At least one Texas court has upheld an award
for lost earning capacity when the only evidence of the plaintiff=s earnings was from twenty years before the accident.  See El Paso Elec. Ry. Co. v. Murphy,
109 S.W. 489, 490 (Tex. Civ. App. 1908, writ ref=d) (AIt must be observed
that the matter to be determined is not what he actually earned before his
injury, but what his earning capacity actually was, and to what extent that
capacity has been impaired.  For whatever
capacity he had for earning money before the injury, whether he exercised it or
not, was his, and he was entitled to it unimpaired by injury wrongfully
inflicted by another.@).

Dr. Hansen testified by
deposition.  He performed a vocational
evaluation of Stacey.  In doing so, he
interviewed Stacey and reviewed, among other things, Stacey=s medical reports and her W-2 statements for 1993 and 1994.  Dr. Hansen also 

did
types of research that were disability and labor market oriented, and those
research items deal with traumatic brain injuries, occupational information
pertaining to the type of work history [Stacey] had, and wage data specific to
the Dallas area in types of jobs that she at one time would have been suitably
employed in.

 








Dr. Hansen testified that
Stacey=s skills before the accident would have enabled her to work as
a communications editor, regulatory affairs analyst, speech writer, management
analyst, and meeting and convention planner. 
Dr. Hansen estimated that those jobs would have a value of $58,000 per
year.  Dr. Hansen specifically stated
that this amount was less than what Stacey would have been earning previously Abecause she=s been out
of the labor market for a number of years and wouldn=t have started [at] as . . . high [a] salary as what she had years
ago.@  Thus, Dr. Hansen not only took
into account Stacey=s past work
history and skills, he also expressly adjusted his determination of her earning
capacity based on the fact that she had been out of the workforce for some
time.  Thus, Dr. Hansen=s testimony about Stacey=s future earning capacity was not speculative based on the almost
ten-year gap in her employment historyCa commonplace occurrence for women in their childbearing years.

4.     Future Physical Impairment








Finally, GM contends that the
evidence is factually insufficient to support the $3.5 million award for future
physical impairment in addition to the awards for future pain and mental
anguish and future lost earning capacity. 
GM asks us to reduce the award to $1 million.  GM relies on the supreme court=s opinion in Golden Eagle Archery, Inc. v. Jackson for the
proposition that Abecause
awards for future physical impairment can lead to double recovery, trial courts
must instruct the jury@ as
follows:  Athat the effect of any physical impairment must be substantial and
extend beyond any pain, suffering, mental anguish, lost wages, or diminished
earning capacity and that a claimant should not be compensated more than once
for the same elements of loss or injury.@  116 S.W.3d 757, 772 (Tex.
2003). 

Here, the trial court instructed
the jury to

[c]onsider
the elements of damages listed below and none other.  Consider each element separately.  In answering this question you shall not
award any sum of money on any element if you have otherwise, under some other
element, awarded a sum of money for the same loss, that is, do not compensate
twice for the same loss.  [Emphasis
added.]

 

This instruction substantially comports with the
mandate of the supreme court in Golden Eagle. 








Physical impairment,
sometimes called loss of enjoyment of life, encompasses the loss of the injured
party=s former lifestyle.  Dawson,
107 S.W.3d at 752; Schindler Elevator Corp. v. Anderson, 78 S.W.3d 392,
412 (Tex. App.CHouston
[14th Dist.] 2001, pet. dism=d by agr.).  Physical impairment
is an element of damages that extends beyond loss of earning capacity and
beyond any pain and suffering, to the extent that it produces a separate loss
that is substantial or extremely disabling. 
Dawson, 107 S.W.3d at 752.  
To recover damages for physical impairment, the plaintiff must show that
(1) he or she incurred injuries that are distinct from, or extend beyond,
injuries compensable as pain and suffering, loss of earning capacity, or other
damage elements and (2) these distinct injuries have had a Asubstantial@
effect.  Tagle v. Galvan, 155
S.W.3d 510, 519 (Tex. App.CSan Antonio 2004, no pet.); Patlyek v. Brittain, 149 S.W.3d
781, 785 (Tex. App.CAustin 2004,
pet. denied); Dawson, 107 S.W.3d at 752. 
If other elements such as pain, suffering, mental anguish, and
disfigurement are submitted, there is little left for which to compensate under
the category of physical impairment other than loss of enjoyment of life.  Golden Eagle, 116 S.W.3d at 772.

In reviewing the factual
sufficiency of a damage award, we must presume that the jury followed the trial
court=s instructions unless the record demonstrates otherwise.  Id. at 771.  In performing such a review, we must consider
all the evidence that bears on the challenged category of damages, even if the
evidence also relates to another category of damages.  Id. at 773.  To do otherwise would mean that evidence that
reasonably could have supported the jury=s award would not be considered, which would be improper.  Id. 
If more than one award in overlapping categories is challenged as
excessive, we must consider all the evidence that relates to the total amount
awarded in all overlapping categories to determine if the total amount awarded
was excessive.  Id. at
773-74.  This likewise gives full effect
to all the evidence without crediting any of the evidence more than once.  Id. at 774.








Thus, we have also reviewed
the evidence to determine whether, when combined, the jury=s awards for past and future pain and suffering and mental anguish,
loss of future earning capacity, and future physical impairment (a total of
$19.1 million) are excessive.  GM
contends that the future physical impairment award should be reduced because
Stacey is Aindependent
in all the activities of daily living@ and does not require supervision because of physical limitations. 

But the evidence at trial
showed that Stacey continued to suffer from physical limitations such as
blurred vision, light sensitivity, abnormal voice tenor, loss of flexibility
and balance, weakness on the right side of her body, and spasticity.  As a result of these problems in addition to
her mental impairments, she could not read to her children, drive a car, or
live without supervision.  As one of
appellees= experts
stated, AEvery aspect of her experience in the world has been altered as a
result of this injury to the brain.@  All of appellees= experts agreed that Stacey had reached maximum improvement and would
continue to have these problems and more throughout the rest of her life.  Based on the record evidence and the
applicable standard of review, we hold that the jury=s award for future physical impairment was not excessive.

We overrule the remainder of
GM=s fifth issue.








VII.  Conclusion

Having
overruled GM=s first
through fourth issues and overruled in part and sustained in part its fifth
issue, we modify the trial court=s judgment to delete the award of bystander damages of $7.5 million to
Chris as next friend for Rachel, Sarah, and Meghan.  In all other respects, we affirm the trial
court=s judgment as modified.

 

 

 

TERRIE LIVINGSTON

JUSTICE

 

PANEL B:   LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

 

DELIVERED:
September 21, 2006











[1]Carol,
the other defendant, is Stacey=s mother and has not appealed
the judgment.





[2]The
parties do not dispute that Stacey=s head hit the B-pillar.  They do, however, dispute whether hitting the
B-pillar was the primary cause of Stacey=s injuries.





[3]The
Suburban is designed around a CK truck frame.





[4]NHTSA conducts safety tests and
promulgates federal safety regulations for automobile manufacturers.  Gen. Motors Corp. v. Harper, 61 S.W.3d
118, 124 (Tex. App.CEastland 2001, pet. denied).





[5]There
is nothing in the record regarding any subsequent changes to the standards.





[6]Act
of June 2, 2003, 78th Leg., R.S., ch. 204, ' 5.02, 2003 Tex. Gen. Laws
847, 861-62, 899.





[7]Lorenz
states this proposition in the context of analyzing the propriety of a jury
instruction and Sims in a factual sufficiency review of the evidence on
design defect.  Lorenz, 896 F.2d
at 150-51; Sims, 932 S.W.2d at 565. 





[8]Dr.
Perl determined that the Suburban was traveling at about eleven miles per hour
when the eighteen-wheeler hit it. 





[9]The
sensors that determined whether to deploy the airbags were accelerometer based,
meaning that they sensed and deployed based on changes in velocity. 





[10]The
record also shows that Mahon stated, ABut then the thing that is to
me disturbing is provides societal benefit.@  Although this statement is somewhat unclearCand
we cannot determine whether it represents Mahon=s
words verbatim or if there has been an omission from the sentence as
transcribedCit
appears from the context of this statement that Mahon is speaking to the
benefit of weighing the small risk of inflation-induced injury in light of a
larger risk of injury to an occupant in a severe side impact in which the
airbag does not deploy.





[11]GM
focuses heavily on its own evidence of its high standards for prevention of
inflation-induced injury risk.  But we
believe that the jury was entitled to weigh the two concerns involvedCinflation-induced
injury and occupant protectionCand determine whether GM
unreasonably placed reduction of a slight inflation-induced injury risk ahead
of occupant protection as a goal.





[12]GM
does not challenge the third element on appeal. 





[13]GM
contends that Caldwell=s
analysis is no evidence of when Stacey=s shoulder impacted the
B-pillar; therefore, there is no evidence that the airbag would have been able
to deploy if her shoulder was too close. 
But appellees=
experts also testified about the safer alternative design of a side airbag that
provides head protection without deploying between the shoulder and the vehicle
interior.





[14]GM
also claims that there is no evidence that deployment of a head protection
airbag in these circumstances would not impose a greater risk to others.  Although we disagree based on the evidence we
have reviewed, we note that this contention is not crucial to our analysis
because we have already determined that the evidence supports appellees=
assertion that the addition of a second sensor in the B-pillar would have
caused the airbag to deploy, preventing Stacey=s
brain injury, without increasing the risk to others.





[15]Friedman
also testified that the Suburban was defective because it did not have enough
padding on the B-pillar.  GM contends
that there is no evidence to support this theory, but we need not address this
contention because we have determined that the evidence is legally sufficient
to prove that the Suburban was defective by failing to include a second sensor
governing deployment of the airbag.  See
Tex. R. App. P. 47.1; Raman
Chandler Props., L.C. v. Caldwell=s Creek Homeowners Ass=n,
Inc., 178 S.W.3d 384, 396 (Tex. App.CFort Worth 2005, pet.
denied).





[16]The
occipital condyle is located at the base of the skull where the skull meets the
spinal cord opening.  





[17]The
C-pillar is part of the truck frame similar to the B-pillar but located next to
the middle seat passenger side of the truck.





[18]GM
claims that Chris Aembraced@ the
girls when they were introduced, but this is not shown in the record. 





[19]See
Gen. Motors Corp. v. Iracheta, 161 S.W.3d 462, 472 (Tex.
2005), cited by GM, in which the Texas Supreme Court held that the trial court=s
unobjected-to error in allowing the grandmother of the deceased plaintiffs to
personally thank the all-Hispanic jury in Spanish was harmful.





[20]Contrary
to GM=s
contentions, the introduction that occurred here is distinguishable from the
grandmother=s
comments in Iracheta.  In that
case, the grandmother of the deceased plaintiffs personally thanked the
all-Hispanic jury in Spanish on behalf of the deceased plaintiffs.  Iracheta, 161 S.W.3d at 472.  Here, neither Chris nor the girls thanked the
jury, nor can we determine from the record that they made any personal
overtures to the jury on behalf of Stacey or themselves.  Moreover, we fail to see how the mere
introduction of the girls to the jury is that much more harmful than the
introduction into evidence of several photographs of Chris, Stacey, and the
girls, which GM does not complain about on appeal.





[21]Appellees
did not dispute at trial that Carol caused the accident, but they did dispute
that all of Stacey=s
injuries were caused by Carol=s actions; specifically, they
contended that had the airbag timely deployed, Stacey would have suffered no
injuries, or much more minor injuries.





[22]Indeed,
we fail to see why such additional detail is necessary given that the jury
heard repeatedly that in the course of violating traffic laws, Carol turned
directly into the path of an eighteen-wheeler traveling over forty miles per
hour.





[23]To be
admissible on the issue of design defect, evidence of other events must be
reasonably similar to the event in which the plaintiff was injured.  See Nissan Motor Co. v. Armstrong, 145
S.W.3d 131, 138-39 (Tex. 2004); Martinez, 977 S.W.2d at 340-41.





[24]He
did not say which little girl was crying, but the evidence shows that Rachel,
who suffered a broken leg in the accident, was still sitting in the back seat
and did not get out of the Suburban immediately after the accident like the
other two girls.